Booker CLEMONS, Plaintiff-Appellee,

v.

MITSUI O. S. K. LINES, LTD. and
Baba-Daiko Shosen, K. K.,
Defendants-Appellants.

No. 78–1812.

United States Court of Appeals,
Seventh Circuit.

Heard Jan. 24, 1979.

Decided April 16, 1979.

Rehearing and Rehearing En Banc
Denied July 3, 1979.

Geoffrey G. Gilbert, Chicago, Ill., for defendants-appellants.

Ernest T. Rossiello, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Circuit Judge, and MARKEY, Judge,* and TONE, Circuit Judge.

PER CURIAM.

In this suit for recovery of damages for personal injury, the amended complaint was, as plaintiff puts it, "concurrently based upon diversity of citizenship. [28 U.S.C. § 1332] and * * * cognizable in admiralty [28 U.S.C. § 1333]."[1] Plaintiff sought $250,000 from the owners of M/V MAYASAN MARU and from co-defendant Baba-Daiko Shosen, K. K., the charterer of the vessel. The amended complaint showed that plaintiff was employed as a longshoreman by Transoceanic Terminals Corporation ("Stevedore"), a stevedoring company, to unload cargo from the M/V MAYASAN MARU in Chicago, Illinois, when he stepped backwards "over an open hatch, causing him to plummet approximately eighteen (18) feet below into a tank." His ensuing injuries were said to have been caused by defendants' failure to provide a safety line or net about the hatch.

At the jury trial, the evidence showed that on November 23, 1976, plaintiff was performing stevedoring services aboard the MAYASAN MARU under contract between the Stevedore and the defendants. He was 66 years old, largely retired, and had 14 years' experience in his trade. He was assigned to work in Hatch No. 4 containing four deep tanks. The aft pair consisted of tanks A and D; the forward pair were designated B and C. Each pair had a common cover and was about 20′ deep and 20′ wide. He was directed to work in tank A. During the afternoon of November 23, he and his fellow longshoremen were discharging bales of wire from that tank and tank D, the other aft tank. This work had not been finished when they stopped for supper at 6:00 PM. They were to return to work at 7:00 PM.

About 4:30 PM that afternoon, a supervisory employee of the Stevedore, identified only as "George," told foreman Albert Johnson, also an employee of the Stevedore, that the longshoremen would load empty tanks B and C after supper and therefore to have the crew open them before then. Consequently, Johnson told a member of the ship's crew to open those tanks between 6:00 PM and 7:00 PM and he did so. A few minutes after 7:00 PM, on returning from his supper break, plaintiff fell backwards into tank C while on his way back to his station in tank A. On his way to tank A, plaintiff had decided to peek into its companion aft tank D to see how the longshoremen who had returned to work ahead of him were doing. Plaintiff testified that thereafter:

"When I straightened up from peeping in D, I stepped backwards. From looking over here, I must have stepped over a little too far. I stepped right over here

* Honorable Howard Thomas Markey, Chief Judge of the U.S. Court of Customs and Patent Appeals, is sitting by designation.

1. Plaintiff's brief 2. However, again according to plaintiff's counsel, the case was tried solely on the theory of defendants' negligence; no concept of unseaworthiness was presented to the jury (Br. 6). The vessel's liability to longshoremen on account of unseaworthy conditions was specifically eliminated by the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act. 33 U.S.C. § 905(b).

in C, this open hole right here \* \* \*." (App. 120.)

At 7:35 PM, the Stevedore employee named George decided that tanks B and C should not be loaded until the following morning. Until then, the ship's crew had still expected tanks B and C to be worked that evening.

After remaining unconscious at the bottom of tank C, plaintiff climbed three sets of ladders to the deck of the ship and reported the incident to Johnson. Plaintiff was then hospitalized for ten days at South Shore Community Hospital where he was diagnosed as having "[m]ild cerebral concussion; superficial laceration of the scalp; contusion, right knee and foot; acute cervical strain; degenerative disease of the thorocolumbar spine and both knees" (Plaintiff's Exhibit 3). His medical expenses totaled approximately $4,000 (Plaintiff's Exhibit 1).

The jury found that plaintiff's contributory negligence was 13% responsible for his fall but entered a verdict of $322,000 for him, and the trial court entered judgment on the verdict for that sum less 13%. Defendants filed a motion for judgment n. o. v. or, in the alternative, for a new trial. After considering defendants' post-trial briefs, the motions were denied, resulting in the filing of this appeal. We reverse on the ground that the motion for judgment notwithstanding the verdict should have been granted.

■ It is true that a court should sparingly enter judgments n. o. v. As Judge Hastings pointed out in *Hohmann v. Packard Instrument Company, Inc.*, 471 F.2d 815, 819 (7th Cir. 1973), a motion for judgment notwithstanding the verdict or for a directed verdict "should be denied where the evidence, along with [the] inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions" (citations omitted). In the present case, we firmly conclude that the evidence is of insufficient probative value for jurors fairly and impartially to differ as to the inferences to be reasonably drawn on the question of whether in the context of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, any negligence could be attributed to these defendants. Consequently, it was error to deny the judgment n. o. v. Wright and Miller, *Federal Practice and Procedure* § 2524; 5A Moore's *Federal Practice* ¶ 50.02[1].

■ Under the provisions of the Longshoremen's and Harbor Workers' Compensation Act as amended in 1972 (33 U.S.C. §§ 901, *et seq.*), Congress placed a longshoreman injured on board a vessel in the same general position as if injured in non-maritime employment ashore, concluding that the major responsibility for the proper and safe conduct of the work is to be borne by the Stevedore, from whom this plaintiff apparently has already recovered workmen's compensation under the Act. Responsibility for the longshoremen's safety was focused on those best able to improve it, the stevedores.[2] Although the shipowner retains the legal duty to exercise ordinary care to keep the premises in a condition reasonably safe for use by the longshoremen, negligence of the shipowners must now be based on negligence principles applicable to land-based activities in non-maritime pursuits. *Chavis v. Finnlines, Ltd.*, 576 F.2d 1072 (4th Cir. 1978). As a result of the amendments to the Act, a vessel owner

---

2. The Occupational and Safety Health Administration (OSHA) regulations establish the standard of care to which the stevedores are held responsible. Although these regulations require numerous specific safety measures, they do not impose even on the Stevedore the duty of running lines between open deep tanks. See 29 C.F.R. §§ 1918.31(e) and 1918.35. If plaintiff had proved that his accident occurred from poor lighting on the ship, the OSHA regulations would place that responsibility on the Stevedore rather than the shipowners. 29 C.F.R. §§ 1918.2 and 1918.92.

is to be judged by the same standard of care as a land owner to a business invitee, such as embodied in Sections 343 and 343A of the Restatement of Torts (2d) (1965).[3]

The 1972 amendments substantially increased the benefits payable under workmen's compensation secured by the longshoreman's employer[4] but made the shipowner liable only for negligence attributable to the vessel, rather than—as had previously been the case—for any unseaworthy condition. The amendments also eliminated the shipowner's third-party action against the longshoreman's employer, in the event the shipowner is held liable for negligence.[5] The House Report accompanying the 1972 amendments makes clear that whether the vessel was negligent is to be determined primarily by established principles of land-based tort law,[6] that the primary responsibility for the safety of the longshoremen rests with the employer,[7] and that the shipowner is not to be held liable for the negligence of the employer.[8] The five Circuits that have considered the question of what standard determines the shipowner's liability under the 1972 amendments have agreed that the shipowner will not be liable if the employer knew (or should have known) of the dangerous condition and nevertheless continued working the longshoremen unless the shipowner knew of special circumstances which would compel the longshoremen to continue to encounter an open and obvious danger which the shipowner was (or should have been) aware of and could have alleviated. *Cox v. Flota Mercante Grancolombiana, S. A.*, 577 F.2d 798 (2d Cir. 1978);[9] *Hurst v. Triad Shipping Co., supra*;[10] *Chavis v. Finnlines, Ltd., supra*, and *Riddle v. Exxon Transportation Co.*, 563 F.2d 1103 (4th Cir. 1977);[11] *Gay v. Ocean Transport & Trading, Ltd.,*

---

3. *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir. 1977); *Anuszewski v. Dynamic Mariners Corp.*, 540 F.2d 757 (4th Cir. 1976), and *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976).

4. The employer is usually a stevedoring company or a shipyard.

5. For detailed explanations of the development of the law in this area and the difficulties that gave rise to the new compromise reflected in the 1972 amendments, see *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1242–1244 (3d Cir. 1977); *Gay v. Ocean Transport & Trading, Ltd., supra*, 1235–1236.

6. H.R.Rep.No.92–1441, 92d Cong., 2d Sess., reprinted in 3 [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4703.

7. *Id.* at 4699.

8. *Id.* at 4703, 4704. The non-liability of the shipowner for the employer's negligence is made explicit in the statute. 33 U.S.C. § 905(b).

9. The jury verdict for the plaintiff was reversed on appeal because the responsibility for seeing that hatch covers were locked in place was the employer's, although it was the job of the vessel's crew to execute the task and it had been asked to do so. Earlier Second Circuit cases holding the shipowner liable are distinguishable on the ground that the ship's officer affirmatively participated in the decision that the longshoremen should continue working despite his knowledge of the dangerous condition (*Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364 (2d Cir. 1978)) or that the vessel operated as its own stevedore, and therefore was the plaintiff's employer (*Napoli v. Hellenic Lines, supra* ).

However, in the most recent Second Circuit case of *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2d Cir. 1978), another panel disagreed with the approach taken in *Cox, supra*, and held the shipowner liable for the negligent act of the vessel's crew even though the employer had responsibility for maintaining safe conditions. Judge Friendly wrote a strong dissent. While it is not clear which approach should properly be attributed to the Second Circuit, in the present case the result would be the same regardless of whether the *Cox* or *Canizzo* standard applied because, as explained *infra*, there was no evidence from which the jury could have properly concluded that the vessel's crew was negligent.

10. A directed verdict for defendant was affirmed because there was no evidence to rebut the shipowner's denial of knowledge of the dangerous condition.

11. Jury verdicts for defendants were upheld on appeal and instructions were approved that stated (1) the shipowner is liable only for hidden dangers which were unknown to the employer in the exercise of ordinary care or (2) the shipowner is not liable for open and obvious dangerous conditions if the employer could have been expected to correct them.

*supra*;[12] *Westcott v. Impresas Armadoras, S. A. Panama,* 564 F.2d 875 (9th Cir. 1977).[13] We agree with the approach taken in those cases and conclude that on the facts of the present case, the plaintiff cannot recover.

Here both the plaintiff and his employer knew that B and C tanks were open and unguarded. After plaintiff reported his fall,[14] his foreman testified that he could see that tank C was open and unguarded when he looked down from the upper deck into the lower hold.[15] Under earlier tort law principles, the fact that the open condition should have been apparent to plaintiff would have precluded his recovery, but the Restatement of Torts creates an exception where the possessor of land (here the possessor of the ship) "should anticipate the harm despite a known or obvious dangerous condition." *Napoli v. Hellenic Lines, Ltd., supra* at 508; Restatement of Torts (2d) § 343A; Prosser, *The Law of Torts* § 61 (4th ed. 1971).[16] Here there was no evidence that defendants should have anticipated that plaintiff, a longtime longshoreman, would be unable to avoid falling backwards into tank C. Since an open tank is a condition routinely encountered by longshoremen, there was no reason to anticipate that anyone would be harmed by it. Therefore the exception in Section 343A is inapplicable.[17] *Stanley v. United States,* 476 F.2d 606, 609 n. 5 (1st Cir. 1973). As in *Stanley,* there is no evidence that defendants should have supposed that the Stevedore would employ careless workers on this job or fail in its obligations to take any needed safety precautions. Therefore, the *Stanley* court, with which we agree, refused to apply the exception embodied in Section 343A.

In addition, in the present case the Stevedore was responsible for the hazard both because it requested the tanks to be opened and because, knowing they were open, it was charged by the Act with seeing to the safety of the longshoremen. After 4:30 PM, the Stevedore instructed the ship's crew to open tanks B and C between 6:00 and 7:00 PM because the longshoremen would be working there after their 7:00 PM return from supper. The undisputed evi-

12. Judgment for defendant shipowner in bench trial was affirmed when the hazard was readily apparent to the employer, even though the shipowner also knew of the danger.

13. Judgment was ordered for defendant shipowner notwithstanding the jury verdict for plaintiff when the operations were within the employer's control and the shipowner was not aware of the danger.

14. Although he testified that he stepped backwards into tank C, plaintiff told Johnson he had missed a step on a ladder (App. 192).

15. Johnson testified that this was the first time he became aware that B and C tanks were open. However, since Johnson at his supervisor's direction had instructed the ship's crew to open those tanks during the supper hour, he and George, his supervisor, must have expected that the crew had followed his directions. Since he had also told the vessel's duty officer that the tanks were to be loaded after supper, Johnson must have expected that no safety line would be rigged because by his own testimony this would not be done if the tanks were to be worked. He did not instruct the vessel's crew to rig a safety line around these tanks either before or after plaintiff's fall.

16. *Arguendo* we are assuming that the exception in Section 343A is the proper standard, but we do not decide that question. The Circuits are divided on the question of whether Section 343A applies when the dangerous condition was either created by or known to the employer. Compare *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977), and *Canizzo v. Farrell Lines,* 579 F.2d 682 (2d Cir. 1978), with *Cox v. Flora Mercante Grancolombiana,* 577 F.2d 798 (2d Cir. 1978); *Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir. 1977); *Chavis v. Finnlines, Ltd.,* 576 F.2d 1072 (4th Cir. 1978); and *Westcott v. Impresas Armadoras, S. A. Panama,* 564 F.2d 875 (9th Cir. 1977).

17. Plaintiff suggests that application of the Restatement of Torts doctrine is tantamount to raising the defenses of contributory negligence or assumption of the risk, and that these defenses are contrary to the intention expressed in the House Report that the maritime concept of comparative fault is to be applied (H.R.Rep. No.92–1441, *supra,* at 4705). However, we read Section 343 together with Section 343A not as providing defenses but as defining when it is negligent to allow the existence of a dangerous condition. Under the Restatement, when the danger is open and obvious and in addition is avoidable in the exercise of ordinary care and therefore the harm is not foreseeable, it is not negligent to allow the danger to exist.

dence showed that, as plaintiff himself testified, in accord with the usual industry practice, no safety line would be placed around tanks being worked (App. 154). As the Stevedore's General Manager Paul Lopes testified, such a line would create a hazard to the longshoremen who would have to go under it (App. 332).

Plaintiff relies on a Chicago port custom that a safety line should be erected around an open deep tank. There is no evidence that this custom was known to defendants.[18] Moreover, the uncontroverted evidence is that this custom applies only to tanks in which no one is to be working. When this accident occurred a few minutes after 7:00 PM, tank C was to be worked that evening. It was not until 7:35 PM that the Stevedore employee named George countermanded his previous order. Indeed the only reason foreman Johnson had ordered the ship's crew to open tank C was to enable it to be worked that evening. Johnson's testimony evidenced what the ship's crew was told and what the custom of stringing safety lines consisted of. He said that he told the ship's duty officer to open the B and C tanks during the supper break because the longshoremen would be working there when they returned (App. 186, 200). By Johnson's own unequivocal testimony, the custom was that no safety lines should be rigged when the longshoremen were working a tank (App. 201), so that if the crew believed the men would be working B and C tanks, the crew would not be expected to rig a line. Johnson consistently testified that if open tanks were not to be worked for some time, a safety line would be rigged (App. 201). There was no evidence that the defendants were aware of or should have been aware of the local custom, nor was there evidence that in the circumstances the failure to rig a line was a departure from the alleged custom.

Additionally, the behavior of the Stevedore belies any possible inference that the ship's crew was negligent. The majority of the longshoremen who were working in the same hatch as plaintiff had returned to work before him, without complaint of the failure to rig lines around the open tanks. The Stevedore, statutorily charged with the primary responsibility for its employees, did not ask the ship's crew to rig a safety line at the time it requested tanks B and C to be opened or after plaintiff's accident. The longshoremen continued to work with all four tanks open and no safety lines around them during the evening after plaintiff's fall and throughout the following day (App. 33). Therefore, the evidence was insufficient to support a verdict for the plaintiff. Even if the absence of a safety line in these circumstances could be considered negligent, the negligence was not shown to be, in the context of the Act, chargeable to the defendants rather than to the Stevedore.

As seen (notes 9–13 *supra*), the pertinent case law is in accord with the undisputed evidence in this case. In addition, *Long v. Silver Lines, Ltd.*, 48 F.2d 15 (2d Cir. 1931); *Miller v. The Sultana*, 176 F.2d 203 (2d Cir. 1949); *Ove Tysko v. Royal Mail Steam Packet Company*, 81 F.2d 960 (9th Cir. 1936), specifically hold that it is not negligent for a hatch to be left open in anticipation of the commencement of cargo work. The authority of these cases has remained undiminished. In fact, plaintiff admits that general maritime law is pertinent and that cases decided on the basis of standards of maritime negligence prior to the 1972 amendments to the Longshoremen's Compensation Act are still viable precedents (Br. 10). In view of our holding that a reasonable jury could not find that this accident was caused by defendants' negligence, it is unnecessary for us to consider other errors claimed by defendants.

The judgment is reversed with directions to enter a new judgment in favor of defendants.

---

18. The deposition testimony of officer Aoshima does not acknowledge the custom described by Johnson. Mr. Aoshima, speaking through an interpreter, merely stated that he believed that all appropriate safety precautions had been taken (App. 227).