James A. HAUER,

v.

BANKERS TRUST NEW YORK CORP. et al.

No. 76–C–372.

United States District Court, E. D. Wisconsin.

March 2, 1981.

James A. Hauer, Elm Grove, Wis., Charles W. Averbeck, of Hauer & Averbeck, Fond du Lac, Wis., Irving I. Saul, Dayton, Ohio, for plaintiff.

Foley & Lardner by Robert A. Christensen, Milwaukee, Wis., for defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

This action was tried to a jury in two stages. On November 7, 1980, after five days of trial, the jury returned a verdict favorable to the plaintiff on his claim that Sackman-Gilliland Corporation, the sole remaining defendant, intentionally interfered with Mr. Hauer's employment relationship with Professional Investors Syndicate. On November 21, 1980, at the conclusion of a three day trial, the same jury returned a verdict awarding the plaintiff $175,001 in compensatory damages and $525,000 in punitive damages. Judgment for the sum of $700,001 was entered in the plaintiff's favor on November 22, 1980.

The matter is presently before me on Sackman-Gilliland's post-trial motions for judgment notwithstanding the verdict, for a new trial, or for a remittitur of the damages awarded by the jury. Because I have concluded that the defendant's motion for judgment notwithstanding the verdict must be granted, this decision will be confined to a discussion of that motion and will not address the alternatives of a new trial or a remittitur.

## I. BACKGROUND

During the events pertinent to this action, the plaintiff was one of three managing partners of Professional Investors Syndicate. Professional Investors Syndicate owned and controlled various entities involved in the construction and development of a "commercial and residential resort oriented project" known as Scotsland. Prem, Inc., one of the corporations owned and controlled by Professional Investors Syndicate, arranged for financing of Scotsland through the defendant Sackman-Gilliland Corporation. This law suit arises out of Sackman-Gilliland's alleged wrongful refusal to extend part of the promised financing for the development of Scotsland and its ultimate decision to assume title to the project.

On February 1, 1972, Prem and Sackman-Gilliland executed a building and loan agreement, a mortgage, and a mortgage note. Pursuant to the building and loan agreement, Sackman-Gilliland agreed to lend $750,000 for the purchase of land and $8,675,000 for building and construction costs. The loan was secured by a mortgage in the sum of $10,535,000, which was filed with the Waukesha County register of deeds on February 2, 1972.

Also on February 1, 1972, the three managing partners of Professional Investors Syndicate executed a mortgage guarantee, making themselves personally liable for the full amount of the loan. The testimony at trial demonstrated that, although Sackman-Gilliland wanted all of the partners in Professional Investors Syndicate to be bound by the mortgage guarantee, Mr. Hauer stated that under the partnership agreement, the other partners were limited partners and could not be made personally liable for the amount of the loan.

On May 15, 1972, the parties executed an amendment to the building and loan agreement and an additional mortgage and mortgage note. The building and loan amendment provided that Sackman-Gilliland would lend an additional $450,000 for the purchase of a tract of land adjacent to Scotsland, the Onasch farm. Pursuant to this amendment, the parties executed a second mortgage and mortgage note which evidenced a total indebtedness of $10,985,-000. The mortgage also contained a "right of first refusal" clause, which obligated Prem to take additional financing from Sackman-Gilliland if the latter agreed to extend such financing on terms at least as

favorable as those offered by competing lenders.

Previously, on May 12, 1972, the three managing partners and most of the other partners of Professional Investors Syndicate executed another mortgage guarantee. Under paragraph eleven of the guarantee, the signers bound themselves to be personally liable up to the sums specified in an addendum to the guarantee. The amount each partner agreed to pledge ranged from $7500 to $30,000, with twenty-four of the twenty-eight signing partners each agreeing to be liable for the sum of $30,000.

During the summer and fall of 1972, it became clear that the sum Sackman-Gilliland had agreed to advance for construction of Scotsland, $8,675,000, would be insufficient for completing the project. By letter dated June 12, 1972, Norman L. Arons, Jr., assistant vice president of Sackman-Gilliland advised Mr. Hauer that he estimated that an additional $4,500,000 above the amount of Sackman-Gilliland's commitment would be needed to complete construction of Scotsland. Mr. Arons requested that Mr. Hauer advise him of how the partnership planned to raise sufficient capital to fill the $4,500,000 gap.

In a letter to the plaintiff dated June 26, 1972, Mr. Arons estimated that the gap would be $6,600,000 and stated that Sackman-Gilliland needed "immediately and without delay, hard evidence as to where at least 5 million dollars of the possible 6.6 million dollar hole is coming from." On August 11, 1972, Mr. Arons wrote Mr. Hauer that the president of Sackman-Gilliland Corporation was very concerned about the gap between the amount of the Sackman-Gilliland loan and the estimated cost to complete the project. Mr. Arons wrote that Sackman-Gilliland wanted to see the members of the partnership invest more of their own money in the project. Mr. Arons stated that within 30 days, Sackman-Gilliland must receive evidence of an infusion of $5,000,000 into the project. In a letter to Mr. Hauer dated December 8, 1972, Mr. Arons was still inquiring about the source of the $5,000,000.

On February 22, 1973, United Jersey Mortgage Company became a substantial financial participant in Sackman-Gilliland's outstanding loan to Prem. United Jersey also agreed to advance fifty percent of the necessary financing in all future loans to Prem.

By the end of March 1973, Prem had drawn $7,850,000 against its $8,625,000 construction loan from Sackman-Gilliland. In connection with Prem's request for an additional draw against the Sackman-Gilliland loan commitment, representatives of Professional Investment Syndicate, including Mr. Hauer, traveled to Sackman-Gilliland's New York office to meet with agents of Sackman-Gilliland. According to the testimony of Mr. Burbach and Mr. Wachtl, the purpose of the meeting was for the partnership to obtain additional financing from Sackman-Gilliland to complete the construction of Scotsland.

Mr. Wachtl and Mr. Burbach testified that Sackman-Gilliland was willing to make an additional loan if the individual partners contributed their respective shares of capital pursuant to the May 12, 1972, mortgage guarantee. Although the Sackman-Gilliland people referred to the sums contained in the mortgage guarantee, which totaled approximately $800,000, Messrs. Burbach and Wachtl testified that they believed Sackman-Gilliland would be satisfied and would advance additional sums if Mr. Hauer used his best efforts to raise an additional $500,000.

During the months of April and May, 1973, when the partnership was attempting to raise the funds which Sackman-Gilliland had requested, Mr. Hauer had conversations with Charles Sussman, the mortgage banker who originally brought the partnership and Sackman-Gilliland together. Mr. Sussman, who was still trying to collect his finder's fee, and being aware that Mr. Hauer was seeking capital, told Mr. Hauer that he could sell the completed shopping center portion of Scotsland for $2,500,000. Under the partnership's loan commitment agreement with Sackman-Gilliland, $1,700,000 of this amount could be paid to Sack-

man-Gilliland to reduce the amount of the mortgage indebtedness, and the partnership would then have a $750,000 profit from which Mr. Sussman's finder's fee and commission could be paid. However, Mr. Hauer testified that Sackman-Gilliland refused to permit the sale of the shopping center.

In addition, Mr. Sussman advised Mr. Hauer that he could sell 40 acres of the 133 acre Onasch farm, which had recently been rezoned to permit the construction of residential units, for a total of $2,500,000. Since the entire farm had been purchased for the sum of $450,000, this would net the partnership a considerable profit. Mr. Hauer testified that Sackman-Gilliland also declined to permit the sale of this portion of the Onasch farm. Mr. Sussman further testified that in both instances, regarding the sale of the shopping center and the portion of the farm, Mr. Hauer never gave him the authority to make the sales, although Mr. Sussman pressured him to do so.

In April and May 1973, Prem drew an additional $1,200,230 against the construction loan. By letter dated May 31, 1973, Sackman-Gilliland offered to make an additional loan of $5,000,000. Testimony at trial, however, demonstrated that the terms of the loan were onerous; Sackman-Gilliland required the payment of a $250,000 commitment fee, and the interest rate was in excess of forty percent per annum.

On June 1, 1973, Sackman-Gilliland cashed out United Jersey Mortgage Bank's participation in the loan to Prem at a cost of $5,000,000. In addition, in early June 1973, a representative of I. J. Markin, Inc., a mortgage bank and wholly owned subsidiary of First National Bank of Chicago, telephoned Sackman-Gilliland to obtain information about Scotsland. Mr. Bohrer, I. J. Markin's representative, testified at trial that he was interested in recommending to his superiors that I. J. Markin lend Prem 17.8 million dollars, which sum would be in addition to the amount loaned by Sackman-Gilliland.

Mr. Gallagher, the Sackman-Gilliland officer with whom Mr. Bohrer spoke, informed Mr. Bohrer that Sackman-Gilliland had a right of first refusal with regard to any future loan to Prem. Mr. Gallagher stated that if any deal could be made resulting in additional financing for Scotsland, Sackman-Gilliland would make it. However, Mr. Gallagher stated that since the members of the partnership were unwilling to invest any of their own money in the project, he did not believe that any deal could be made. Mr. Bohrer testified that Mr. Gallagher generally discouraged I. J. Markin from becoming interested in the Scotsland loan and that his discussion with Mr. Gallagher persuaded him not to pursue the matter further.

On June 12, 1973, Messrs. Hauer, Wachtl and Burbach again met with officers of Sackman-Gilliland in New York for the purpose of accepting Sackman-Gilliland's May 31st offer to lend an additional $5,000,000. The partnership had an immediate need for additional funds because of outstanding bills for materials and labor on construction of Scotsland. Warren A. Sackman, chairman of the board of Sackman-Gilliland Corporation, participated in the meeting and at the outset announced that Sackman-Gilliland would not advance any further funding because it was clear to him that the partnership members were not going to invest any of their own money. Mr. Sackman demanded a deed to the property in lieu of foreclosure.

Mr. Hauer reported that the partnership members had contributed $540,000 since the meeting in April 1973. Mr. Hauer also reported that this money had been placed into the Prem operating account and had already been paid out for materials and labor. Mr. Sackman asserted that this was not enough and that Sackman-Gilliland wanted to take title to the project. Messrs. Wachtl and Burbach also testified that Mr. Sackman exhibited animosity toward Mr. Hauer and that Mr. Sackman stated that, of present management, only Paul McDonough, a Prem officer and project manager, would be retained once Sackman-Gilliland took over the project.

Shortly thereafter, on two occasions, Mark Camp, an attorney hired by Profes-

sional Investors Syndicate, traveled to New York to meet with the Sackman-Gilliland people in an effort to find a solution. At that time, Mr. Camp understood that Sackman-Gilliland had already paid out all of the funds it was committed to pay and that nearly ten million dollars more would be needed to complete the project. Mr. Camp testified that Sackman-Gilliland made an offer which fell well short of the necessary ten million dollars. The participants then discussed the transfer of title to Sackman-Gilliland in exchange for Sackman-Gilliland's cancelling Prem's mortgage indebtedness and Sackman-Gilliland's indemnifying the members of Professional Investors Syndicate against claims of materialmen and subcontractors. Under this arrangement, members of Professional Investors Syndicate would lose all the cash they had invested in the project. As a third alternative, Mr. Sackman suggested that Sackman-Gilliland could impose personal liability on the members of the partnership for the full amount of the mortgage indebtedness.

Some time after these meetings, Mr. Camp concluded that Professional Investors Syndicate was not a limited partnership and that there was a "strong probability" that each member could be held personally liable for the debt to Sackman-Gilliland. Mr. Camp recommended that the partnership should accept Sackman-Gilliland's offer to cancel the indebtedness and indemnify the members against the claims of materialmen and subcontractors in exchange for title to the project. Ultimately, the partnership accepted this proposal.

Shortly thereafter, Mr. Wachtl, one of the managing partners of Professional Investors Syndicate, met with Mr. Hauer and asked Mr. Hauer to resign from Professional Investors Syndicate and his other offices connected with the development of Scotsland. On July 9, 1979, Mr. Hauer signed such a resignation, which had previously been prepared by Mr. Wachtl.

Sometime later in the summer of 1973, after Sackman-Gilliland had taken over the project, several officers of Sackman-Gilliland traveled to Milwaukee to inspect the project. A meeting occurred between Sackman-Gilliland officers and Dennis Visintainer, a manager of a clothing store which was a tenant in the shopping center. The Sackman-Gilliland officers included Warren Sackman and Ralph Spina, a senior officer and attorney.

Mr. Visintainer testified at trial that the officers questioned him about financing of his store. He responded that there was an outstanding loan to a local bank which had been personally guaranteed by Mr. Hauer. When Mr. Visintainer mentioned that the plaintiff had not paid off the loan, Mr. Sackman began to disparage Mr. Hauer. As Mr. Sackman, whose nickname is "Turk", became more heated in his remarks regarding the plaintiff, Mr. Spina interrupted and stated, according to the testimony of Mr. Visintainer, "Just a minute, Turk, I think everybody here knows that you'd do anything you can to hang Jim Hauer, ... I think we should end that discussion right now." The conversation then ended.

Nearly a year later, during the summer of 1974, Mr. Sussman spoke with an officer of Sackman-Gilliland, Mr. Gallagher, about Scotsland. Mr. Sussman asked what had become of the project, and Mr. Gallagher replied that Sackman-Gilliland had taken control of it. Mr. Gallagher told Mr. Sussman that Sackman-Gilliland had completed the project and it had then been bought "by two insiders." Mr. Gallagher declined to identify the insiders, according to the testimony of Mr. Sussman.

## II. THE LAWSUITS

On April 8, 1974, Mr. Hauer filed an action, individually and on behalf of Professional Investors Syndicate and Prem, Inc., against seven defendants named in the instant action, including Sackman-Gilliland Corporation. Mr. Hauer filed an amended complaint on June 26, 1974. On December 11, 1974, I granted the defendants' motion for summary judgment and dismissed the amended complaint. *Hauer v. Bankers Trust New York Corp.*, 65 F.R.D. 1 (E.D. Wis. 1974). Finding that under Wisconsin law Mr. Hauer's right to pursue the claims

of the partnership depended upon the will of the managing partners, and that a majority of the managing partners did not wish to pursue the claims in the amended complaint, I held that

> "because Mr. Hauer lacks the capacity to assert any of the claims of the amended complaint on behalf of either Professional Investors [Syndicate] or Prem, the defendants' motion for summary judgment should be granted." *Id.* at 4.

On May 28, 1976, Mr. Hauer and two other plaintiffs filed the instant action against Bankers Trust New York Corporation, Sackman-Gilliland, and five other defendants. On January 27, 1977, I granted in part the defendants' motion to dismiss and dismissed eight of the eleven counts of the complaint, including the only counts which stated claims on behalf of the other two plaintiffs. *Hauer v. Bankers Trust New York Corp.*, 425 F.Supp. 796 (E.D.Wis. 1977). I also ordered the plaintiff to file an amended complaint repleading those claims stated in counts I, II and III.

On March 8, 1977, Mr. Hauer filed the amended complaint which forms the basis of these proceedings. The complaint stated three separate causes of action against each of the seven defendants named, including Sackman-Gilliland. Count I stated a claim for relief on the basis of alleged intentional infliction of emotional distress. Count I demanded the recovery of $3,000,000 in compensatory damages and $9,000,000 in punitive damages. Count II stated a cause of action for tortious interference with contract and also demanded the recovery of $3,000,000 in compensatory and $9,000,000 in punitive damages. Count III stated a claim based on alleged antitrust violations and demanded treble damages in the amount of $9,000,000.

On December 19, 1979, after more than three years of discovery, I appointed a special master "to supervise and to facilitate the trial preparation process in this action." Subsequently, the special master met with counsel for both parties and received a substantial volume of pretrial evidentiary material and legal memoranda. On May 6, 1980, the defendants filed a motion to dismiss the three remaining counts in the amended complaint. On the basis of the parties' pretrial submissions, supporting and opposing memoranda, and the special master's report, I entered an order dismissing counts I and III of the amended complaint and dismissing Bankers Trust New York Corporation. *Hauer v. Bankers Trust New York Corp.*, 450 F.Supp. 103 (E.D.Wis.1980). However, I denied the defendants' motion to dismiss count II, the claim for tortious interference with contract, and set the matter for trial. Five of the six remaining defendants were dismissed at trial, at the close of the plaintiff's case, leaving only Sackman-Gilliland.

## III. DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

■ It is well settled that judgments notwithstanding the verdict should sparingly be entered.

> "[A] motion for judgment notwithstanding the verdict or for a directed verdict 'should be denied where the evidence, along with the inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions.'" *Clemons v. Mitsui O.S.K. Lines, Ltd.*, 596 F.2d 746, 748 (7th Cir. 1979), quoting *Hohmann v. Packard Instrument Company, Inc.*, 471 F.2d 815, 819 (7th Cir. 1973).

It is also established, however, that when "the evidence is of insufficient probative value for jurors fairly and impartially to differ as to the inferences to be reasonably drawn" therefrom, it is error to deny a motion for judgment notwithstanding the verdict. *Id.* at 748.

Before considering whether the evidence and any inferences reasonably drawn therefrom support the jury's verdict in this case, it is necessary to set forth the law applicable to the plaintiff's claim for intentional interference with contractual relations. As

I instructed the jury in this case on November 7, 1980, using slightly modified instructions submitted by the plaintiff, the plaintiff had to prove by a preponderance of the evidence each of five separate elements. First, Mr. Hauer had to prove that at the time of the acts complained of he was a party to a valid employment relationship with Professional Investors Syndicate; second, Mr. Hauer had to demonstrate that Sackman-Gilliland either knew of the existence of this relationship or, under the circumstances, should have known of this relationship; third, the plaintiff had to prove that Sackman-Gilliland intentionally induced Professional Investors Syndicate to terminate its employment relationship with the plaintiff; fourth, the plaintiff had to prove that the intentional acts of Sackman-Gilliland caused Professional Investors Syndicate to terminate the employment relationship it had with Mr. Hauer; and fifth, that Sackman-Gilliland's acts were improper or not privileged.

In his arguments, both to the jury and in opposition to the defendant's instant motion, the plaintiff has relied upon certain specific contentions, which I intend to discuss and evaluate in this memorandum. First, the plaintiff points to Sackman-Gilliland's refusal to permit the sale of severable portions of the project, i. e. the shopping center and the Onasch farm, as a means of generating additional capital. Second, the plaintiff relies on Sackman-Gilliland's effort to discourage I. J. Markin, Inc. from loaning the partnership 17.8 million dollars, thereby allowing the partnership to pay off Sackman-Gilliland's loan. In this regard, the plaintiff emphasizes that Sackman-Gilliland misrepresented that the individual partners were unwilling to invest any of their own money; by early June, they had recently contributed approximately $540,000.

Third, Mr. Hauer relies on Sackman-Gilliland's decision to cash-out United Jersey Mortgage Company's five million dollar participation in the loan at a time when Sackman-Gilliland was complaining that the Scotsland project was an apparent loser. Fourth, Mr. Hauer points to Sackman-Gilliland's refusal to lend more money except at an exorbitant interest rate. Fifth, the plaintiff emphasizes Sackman-Gilliland's effort to induce the other members of the partnership to believe that they were general rather than limited partners and thus vulnerable for the full amount of the loan, despite Mr. Hauer's assertion at the February 1, 1972, closing that he was not authorized by the partnership agreement to commit the other partners to broad liability.

Sixth, Mr. Hauer points to Warren Sackman's statement at the June 12th meeting that only Paul McDonough would be retained from present management after Sackman-Gilliland took over the project. Seventh, the plaintiff relies on the statement made by Mr. Spina at the meeting with Dennis Visintainer in the summer of 1973 regarding Mr. Sackman's desire "to hang Jim Hauer." Finally, Mr. Hauer calls attention to the statements of Mr. Gallagher in the summer of 1974 regarding the purchase of Scotsland by two "insiders."

Basically, the plaintiff's theory of the evidence described above is that Sackman-Gilliland acted avariciously, i.e., Sackman-Gilliland improperly and greedily appropriated the equity which the partnership had created in the project at no cost to itself. In his closing argument, the plaintiff's attorney emphasized that Sackman-Gilliland's decisions to remove the participating lender and to take over the project were inconsistent with its contemporaneous assertions that the project was a loser. The plaintiff's counsel argued that Sackman-Gilliland deliberately undercut the plaintiff's standing with the partnership so that it could wrongfully obtain title to the Scotsland project.

In evaluating the merits of the plaintiff's evidentiary arguments, I am required by the law of this case to draw a distinction between the conduct of Sackman-Gilliland toward Prem and Professional Investors Syndicate and the conduct of Sackman-Gilliland toward Mr. Hauer personally. For, as I held in my order dismissing the plaintiff's original, 1974 action, Mr. Hauer may not recover for injuries to the

partnership and its affiliates; he may only recover for injuries, if any, to himself. This conclusion also follows from the nature of the plaintiff's cause of action—tortious interference with contractual relations.

In other words, if Sackman-Gilliland acted improperly toward the partnership, then it is the partnership's exclusive right to redress any wrongs suffered as a result of such improper conduct. *Hauer v. Bankers Trust New York Corp., supra,* 65 F.R.D. at 3–4. On the other hand, Mr. Hauer had an employment relationship with Professional Investors Syndicate; if Sackman-Gilliland intentionally caused a disruption of that relationship, the plaintiff has recourse against Sackman-Gilliland, and the verdict must stand. However, it would be improper to sustain the jury verdict on the basis of evidence which demonstrates that Sackman-Gilliland violated only the rights of the partnership; to do so would be grossly unfair to the other partners, because the plaintiff would then recover damages which rightfully belong to the partnership.

▪ In light of this important distinction, I am fully persuaded that the evidence and reasonable inferences drawn therefrom do not support the jury's finding that Sackman-Gilliland acted tortiously toward Mr. Hauer personally. The evidence described above and the inferences the plaintiff draws from the evidence arguably support the theory that Sackman-Gilliland misappropriated an equity that the *partnership* had in the Scotsland project. In addition, it cannot be denied that the value of the partnership's equity in Scotsland was directly related to the creativity and industry of the plaintiff, James Hauer. However, this does not mean that Sackman-Gilliland has deprived Mr. Hauer of any rights or property belonging to him personally.

Addressing the plaintiff's evidentiary arguments seriatim, I believe that a reasonable juror could not conclude from the following events that Sackman-Gilliland intentionally caused the partnership to terminate its employment relationship with the plaintiff: the refusal to permit the sale of severable portions of the project as a means of raising the demanded funds; the effort to keep I. J. Markin out of the project; the cashing-out of United Jersey Mortgage Bank's participation in the loan, at a cost of $5,000,000; the effort to induce the other partners to believe that they were vulnerable to full liability for the amount of the loan; the refusal to advance more cash except at an exorbitant interest rate; the decision to take over the project; and, lastly, the sale of the project to "insiders."

To be sure, this evidence, when considered in the light most favorable to the plaintiff, strongly suggests that Sackman-Gilliland acted improperly. However, there is nothing in the above-mentioned evidence which even remotely suggests that Sackman-Gilliland acted illegally toward the plaintiff personally, as distinguished from the partnership.

The other evidence upon which the plaintiff relies is Mr. Sackman's statement that only Paul McDonough would be retained from "present management" after Sackman-Gilliland assumed control and Mr. Spina's statement in the presence of Dennis Visintainer that Mr. Sackman would do anything he could to hang Mr. Hauer. With regard to the first statement, this demonstrates that Sackman-Gilliland was displeased with the way Mr. Hauer and the partnership had managed the development of Scotsland and that Sackman-Gilliland intended to implement its own managerial concept *after* it assumed title to the project. Obviously, Sackman-Gilliland wanted to remove Mr. Hauer and the partnership from control of the project, but this does not support the jury's finding that Sackman-Gilliland wanted to induce a rupture between the plaintiff and the partnership.

▪ With regard to Mr. Visintainer's testimony, this is evidence of umbrage on the part of Warren Sackman toward Mr. Hauer, but is this probative evidence that Sackman-Gilliland intentionally induced the partnership to terminate its employment relationship with Mr. Hauer? I am persuaded that it is not—either standing alone or when considered together with the other evidence discussed above.

Although the plaintiff derives much support from the evidence of hostility which apparently developed on the part of some Sackman-Gilliland officers, the record is notably silent of any effort on the part of these same officers to arrange a deal with other members of the partnership providing for additional financing contingent on the termination of Mr. Hauer. Not a single witness who was present at the June 12, 1973, meeting testified to such an undertaking. Nor did Mr. Camp, who testified that Warren Sackman outlined two or three alternative means of resolving the dispute, in any way suggest that one alternative would be for the partnership to sever its relationship with the plaintiff. What the evidence does demonstrate, however, is that shortly after the June meetings in New York, Mr. Wachtl independently requested Mr. Hauer to resign from his offices with the partnership; there is simply no probative evidence that Sackman-Gilliland acted with a purpose to cause this result.

An examination of portions of the amended complaint and the plaintiff's closing argument demonstrates that Mr. Hauer has not distinguished between harm to the partnership and harm to himself. The amended complaint contains the following allegations:

"Defendants, through a sophisticated series of events, entrapped, restrained and victimized plaintiff, [and Professional Investors Syndicate and Prem] so totally that refinancing plans and other escapes once available to them became impossible to attain. . . . SACKMAN [Gilliland], through its agents, . . . secretly and fraudulently conspired with others to sabotage and control the Scotsland Project. . . . Marty Gallagher, serving as an officer of . . . SACKMAN, conspired secretly with Paul McDonough . . . . The conspiracy, beginning in March, 1973, sought to sabotage the Scotsland project and permit SACKMAN to take control and ownership of the Scotsland project. . . . The acts and statements [of the conspirators] were intended to eliminate plaintiff [and Professional Investors Syndicate and Prem] and other entities thereof from the ownership, control, management and operation of the Scotsland Project." Amended complaint at ¶¶ 2.21, 2.22, 2.24, 2.28.

A fair and liberal reading of these allegations clearly discloses that the plaintiff was harmed by the acts of Sackman-Gilliland, if at all, solely because he was a member of the partnership; the only loss charged or proved was a loss to the partnership, borne by all the members of the partnership.

In the same vein are the following remarks made by the plaintiff's attorney in his closing argument, which could only have confused the jury as to who was the actual injured party:

"Now, this is what Mr. Sackman couldn't see. The [partners], in his view, already got their investment back through [tax losses], and now these people chanced to have millions involved in this land, and it's Mr. Sackman's money as their lender, how is that fair to Mr. Sackman? Well, he is in the banking business. If he wanted to devote four years of his life to go out into Wisconsin and find a piece of ground and develop it the same way, God bless him. We wish him nothing but the best; but don't take it from the efforts of a person who had nothing to do with Mr. Sackman when he created that value. . . . So, while we are telling this man, oh, you don't need to go anywhere else, we are going to lend you $5,000,000.00, they turn down the sale, they turn down the opportunity to refinance on a false inducement to believe you are going to get the money from them. That's wrongful means, ladies and gentlemen."

In his closing argument, the plaintiff's attorney repeatedly returned to the theme that Sackman-Gilliland improperly acquired property which belonged to Mr. Hauer and which was developed through his exclusive efforts. However, it has never been disputed by anyone during the course of these proceedings that the project was owned by the partnership and its affiliate and that the tasks which the plaintiff performed could not have been undertaken without the financial backing of the partnership.

One cannot examine the record before this court without experiencing the feeling that a wrong has been committed. However, for reasons of their own, a majority of the managing partners elected not to pursue any cause of action the partnership may have had against Sackman-Gilliland, and Mr. Hauer did not invoke whatever remedies he might have had against the partnership. The question I must answer is does the evidence, when viewed in the light most favorable to the plaintiff, support the jury's finding that Mr. Hauer's personal rights were violated by Sackman-Gilliland? I must answer this question negatively.

### IV. CONCLUSION

In sum, although I am very hesitant to disturb the jury's finding and award, I am satisfied that no reasonable juror could find on the basis of the evidence produced at trial and the reasonable inferences to be drawn from such evidence that Sackman-Gilliland intentionally caused or induced the partnership to terminate its relationship with the plaintiff or to ask him to resign. Accordingly, the defendant's motion for judgment notwithstanding the verdict must be granted.

Therefore, IT IS ORDERED that the motion of the defendant Sackman-Gilliland Corporation for judgment notwithstanding the verdict be and hereby is granted.

IT IS ALSO ORDERED that the alternative motions of the defendant for a new trial or for a remittitur be and hereby are dismissed as moot.

IT IS FURTHER ORDERED that the judgment entered in this case in favor of the plaintiff on November 22, 1980, be and hereby is vacated and that judgment be entered in favor of the defendant dismissing the complaint.