Dennis CAMERON, Plaintiff-Appellee,

v.

**CONSOLIDATED GRAIN AND BARGE COMPANY, Defendant-Appellant.**

No. 80–1638.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1981.

Decided July 15, 1981.

As Corrected July 21, 1981.

Rehearing Denied Nov. 2, 1981.

Gary T. Sacks, Goldstein & Price, St. Louis, Mo., for defendant-appellant.

Paul McCambridge, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT,[1] Senior Circuit Judge, FAIRCHILD,[2] and BAUER, Circuit Judges.

---

**1.** At the time of oral argument, Judge Swygert was a circuit judge in active service; he assumed senior status on July 1, 1981.

SWYGERT, Senior Circuit Judge.

Pursuant to Section 5(b) of the Long-shoremen's and Harbor Workers' Compensation Act ("LHWCA"), as amended,[3] 33 U.S.C. § 905(b), plaintiff-appellee Dennis Cameron brought this negligence action against the owner, for purposes of this action, of grain barge AW–14, defendant-appellant Consolidated Grain and Barge Co. ("Consolidated").[4] The jury found that Consolidated's negligence caused Cameron's injuries, that $150,000 was fair and adequate compensation for all of Cameron's injuries, and that Cameron's own negligence was one-third of the cause of his injuries. Accordingly, the district court entered a $100,000 judgment for Cameron.

The trial court denied Consolidated's motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial. We hold that the evidence was insufficient as a matter of law to support a judgment for the plaintiff because there was no proof of Consolidated's actual or constructive notice of the condition to which Cameron's injuries are attributed. Consequently, we reverse.[5]

## I.

When reviewing the district court's denials of Consolidated's motions for a directed verdict and for judgment notwithstanding the verdict we must view the evidence in the light most favorable to Cameron, giving him the benefit of all inferences fairly supported by the evidence. 5A *Moore's Federal Practice* ¶'s 50.02[1], 50.07[2] (review of dispositions of motions for directed verdict and for judgment n. o. v. pursuant to same standard). Nonetheless the defendant's evidence must be considered as well as the plaintiff's evidence in reviewing the denial of the defendant's renewed motion for a directed verdict at the close of all the evidence and the denial of the defendant's post-verdict motions. Wright & Miller, *Federal Practice and Procedure: Civil* § 2534. With this in mind, we proceed to set forth the pertinent facts.

Barge AW–14 is an unpowered hopper barge with no crew of its own. Each of its eleven steel lift-off hatch covers has two sets of grain doors. The grain doors each weigh approximately three hundred pounds. When they are lifted manually two workers must perform the task. Both the hatch covers and the grain doors have rain seals to prevent water from entering the barge hopper.[6] At the time of Cameron's accident, AW–14 was one year old which, by industry standards, is considered virtually new.

At all times pertinent to this action, Cameron and his first cousin, La Verne Smith, were employees of the Illinois Grain Corporation. On March 13, 1974, they were working together aboard barge AW–14 at Illinois Grain's Morris, Illinois facility. As required by Government regulations, they wore life jackets while working on the barge. These fastened in the front with two metal clasps, one of which was shaped like an anchor. While closing one of the grain doors on AW–14 with Smith, Camer-

---

**2.** At the time of oral argument, Judge Fairchild was Chief Judge of the Circuit. As of July 1, 1981 he resumed the title of Circuit Judge.

**3.** Pub.L. 92–576, 86 Stat. 1251, amending 33 U.S.C. §§ 901 *et seq.*

**4.** *This action was filed originally in the Circuit Court of LaSalle County, Illinois, but was removed to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1441(b). After removal, Henning Hilliard was added as a defendant. A subsequent grant of Hilliard's motion for summary judgment and dismissal of the action against him is not challenged in this appeal.*

**5.** Our disposition of this case makes it unnecessary to consider Consolidated's other arguments.

**6.** Except for the two on the ends of the barge, the hatch covers are interchangeable. To unload the barge all of the hatch covers are removed. Sometimes they are removed when the barge is loaded or cleaned. Cleaning normally occurs twelve to sixteen times per year. When the covers are removed, except for the two end covers, they are not necessarily replaced in their previous positions.

on was severely injured when a fastened buckle from his life jacket caught on a protrusion on the door's rain seal.

On September 4, 1979, more than five years after his accident, Cameron inspected barge AW–14 to determine if it was the barge upon which the accident occurred.[7] He identified the third door on the bow side as the site of the accident.[8] During this inspection, photographs of AW–14 and the grain door identified by Cameron were taken. According to Cameron's trial testimony, the photograph of the grain door taken that day (Plaintiff's Exhibit 11), showing a protrusion on the rain seal, depicts the door in the condition it was in on the day of the accident. However, in sworn answers to interrogatories dated September 12, 1979, Cameron answered "unknown" to the following:

[s]tate:

(a) The number of barge door panels that were in a state of harmful disrepair and dangerous condition for a long period of time; [and]

(b) Describe the state of harmful disrepair and dangerous conditions[.]

Because Cameron did not present evidence or argue that Consolidated had actual knowledge of the protrusion prior to the accident, we consider only the proof, if any, of Consolidated's constructive notice of this condition.[9] In this regard, we note that no evidence was presented showing when the damage to the rain seal occurred.

Barge AW–14 arrived at Illinois Grain the night before Cameron's accident, having been towed from Lemont Barge Cleaning in Lemont, Illinois on March 11.[10] From the time the barge arrived at Illinois Grain it was in the exclusive control of Illinois Grain employees. However, Cameron testified that, so far as he knew, no Illinois Grain employees were aboard the barge or opened any of its grain doors from the time AW–14 arrived on March 12 until the accident. It is unclear from the record how Cameron would have known if Illinois Grain employees had been on the barge during this period. Cameron's testimony is the only evidence regarding this issue.

In March, 1974, with exceptions not pertinent to this case, Consolidated neither owned any towboats to push its barges nor employed any persons to load and unload barges. Dale Sondgeroth was Consolidated's assistant barge manager. Although his duties included overseeing the movement of barges and their maintenance and repair, Consolidated itself did not have any employees to inspect its barges for defects or items in need of repair. Instead Consolidated relied upon barge cleaners and towboat employees to make such inspections. Sondgeroth testified that this method of inspection was an industry practice. However, he admitted that nobody from Consolidated supervised the inspections and that Consolidated could not verify whether the inspections in fact were performed. Cameron's expert witness agreed that Consolidated's reliance upon others for inspections and repairs was consistent with industry practice. Cameron's expert stated further that, so long as the inspector was competent, such a practice was safe and reasonable. Cameron did not adduce any evidence showing that the inspectors which Consolidated relied upon immediately before the accident were not competent.

Ray Dawsey was the owner of Lemont Barge Cleaning, which cleaned, inspected and repaired river barges. Dawsey testified that he personally worked on every barge at his company. Lemont's business records indicated that three days before Cameron's injury barge AW–14 had been

---

7. On August 9, 1976, in sworn answers to interrogatories, Cameron had stated that he did not know the identity of the barge.

8. Thus, the door Cameron identified was in one of the barge's interchangeable hatch covers. *See* n.6, *supra.* However, Cameron testified that he did not know that these hatch covers are interchangeable.

9. Cameron testified that he did not know whether or not Consolidated knew of the protrusion prior to the accident.

10. Cameron was not present when the barge arrived at Illinois Grain.

inspected, cleaned and released for loading. Those records also indicated that the inspection, which included an examination of the hatch doors, did not reveal any need for repairs. Dawsey testified that if the condition depicted in Plaintiff's Exhibit 11, the photograph of AW–14 taken in September, 1979 showing the protrusion upon which Cameron's buckle snagged, had been present during his inspection, it would have been repaired and the cost of the repair shown on the invoice. The invoice, however, showed no such repair and Dawsey stated unequivocally that the depicted protrusion was not present when AW–14 left Lemont Barge Cleaning. Dawsey's testimony is the only evidence regarding the condition of the barge prior to Cameron's accident.[11]

## II.

The standard of a shipowner's liability under section 905(b) recently has been discussed by the Supreme Court in *Scindia Steam Nav. Co., Ltd. v. De Los Santos,* —— U.S. ——, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).[12] With respect to the determinative issue in this case the Court stated:

> The shipowner ... has a duty with respect to the condition of the ship's gear, equipment, tools and workspace to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger *which would have been known to him in the exercise of reasonable care,* he has breached his duty and is liable if his negligence causes injury to a longshoreman.... [A]bsent contract provision, positive law or custom to the contrary ... *the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.*

101 S.Ct. at 1621–22, 1624 (emphasis supplied). Thus, under the appropriate negligence standard Cameron was required to prove, at least, that Consolidated should have known of the protrusion prior to the accident. *See Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 168 (2d Cir. 1980).[13]

---

**11.** There was also evidence regarding the inspection and condition of AW–14 after Cameron's accident. On June 7, 1975, John Stickling a marine surveyor and president of Marine Loss Control personally performed an on-charter survey aboard AW–14. Such a survey is very detailed. Its purpose is to verify the condition of a barge "which is going to be operated by a new party so that that condition can be later compared with the condition of that vessel as it comes off charter." The condition depicted in Plaintiff's Exhibit 11 would be included in an on-charter survey report if present because it could affect the condition of the cargo. Such a condition was not indicated in Stickling's report and he testified that it was not present at the time of the survey. In fact, Stickling testified that he found no distortions, jagged edges, or protrusions on any of the grain doors or hatch cover doors. On the other hand, the June 7 on-charter survey and an off-charter survey conducted on July 24, 1975 did reveal some other items in need of repair. Sondgeroth testified that no repairs were made as a result of these survey reports.

There also was evidence regarding AW–14's condition in 1976. It had been repaired and painted in January and February of 1976 by Carline Fleet, Inc. Carline's general manager, Lonnie Breaux, testified that barges such as AW–14 were inspected and repaired prior to

painting. There is no indication that Carline found or repaired the condition depicted in Plaintiff's Exhibit 11. Breaux testified that such a condition would have been repaired prior to painting.

**12.** In Part II of *Scindia Steam* the Court also reviewed the 1972 amendments to the Act. It noted that the new provisions "radically" changed the prior scheme. A shipowner's liability without fault for unseaworthiness was abolished, leaving an injured longshoreman with an action for negligence only. 101 S.Ct. at 1620–21. *See also Clemons v. Mitsui O.S.K. Lines, Ltd.,* 596 F.2d 746, 749 (7th Cir. 1979).

**13.** Cameron points to evidence that, in 1975, on-charter and off-charter survey reports both indicated items in need of repair and Sondgeroth's testimony that the indicated repairs were not made as proof of Consolidated's negligence. However, neither of the reports noted a condition similar to the protrusion to which Cameron's injury is attributed. Moreover, at most this evidence tends to show that Consolidated may have been less than diligent with respect to repairs to AW–14 more than one year *after* Cameron's injury. In no way does it tend to prove actual or constructive notice of the protrusion *before* the injury. *Cf.* McCormick, *Evidence* § 200, at 475 (2d ed. 1972) (discussing

Regarding the proof of notice, this case is similar to *Rice v. Atlantic Gulf & Pacific Co.*, 484 F.2d 1318 (2d Cir. 1973), in which the Second Circuit affirmed the trial court's grant of judgment n. o. v. for the defendant shipowner after the jury had returned a $75,000 verdict on the plaintiff's negligence claim.[14] In *Rice* the plaintiff was injured when he slipped and fell on a metal stairway leading from the fire room to the main deck of a dredge. The mishap was caused by the "slipperiness" and "oiliness" of the stairway and the lurching of the vessel. The plaintiff testified that he had not seen grease or oil on the stairway immediately before the accident, but that he found oil on his shirt and arm after the fall which had not been there previously. 484 F.2d at 1319. The Second Circuit agreed with the trial court that there was insufficient evidence of negligence. It stated:

> [T]here was no evidence at trial tending to show actual or constructive notice. . . . [A]ssuming there was such an accumulation of oil or grease on the ladder, there was no evidence regarding . . . the length of time it had been there. In the absence of such evidence the jury could not reasonably find actual or constructive notice.

484 F.2d at 1320 (citations omitted).

In this case, as discussed in Part I, *supra*, the only evidence regarding the existence of the protrusion before Cameron's accident was the testimony of Raymond Dawsey and the documents submitted regarding the cleaning and inspection of AW–14 three days before the accident. That evidence, however, showed only that the protrusion was not present prior to the acc.'*1*ent. Cameron himself admitted on cross-examination that he did not see the protrusion prior to the accident and that he did not know how long it had been on the door.[15]

Thus, the record contains no evidence to support Cameron's argument that the protrusion was present when AW–14 arrived at Illinois Grain and that Consolidated should have known about it prior to the accident. This is not a case in which the jury was compelled to choose between two conflicting bodies of proof. Rather, the jury was confronted with Cameron's unsupported assertions, on the one hand, and Consolidated's proof to the contrary, on the other. Consolidated proved that AW–14 was inspected in a reasonable and safe manner consistent with industry standards only three days prior to the accident and that the inspection did not reveal the protrusion which caused Cameron's injury. Cameron offered no proof that the inspection was improper. Consolidated also showed that the protrusion was not "wear and tear" but could have been caused by a single incident prior to Cameron's accident. Cameron admitted that the barge was in the exclusive

---

requirement that to prove notice evidence must be of similar happening which occurred prior to incident at issue).

14. Although *Rice* was decided according to standards of maritime negligence prior to the 1972 amendments to the LHWCA, with respect to the notice issue the court applied essentially the same standard articulated in *Scindia Steam*. Also, as we previously have stated, cases such as *Rice* remain viable precedents even after the 1972 amendments. *Clemons v. Mitsui O.S.K. Lines, Ltd.*, 596 F.2d at 751.

15. Cameron also stated that the protrusion could have been caused by the last people to handle the door before him. This is consistent with the testimony of Ralph Clark, defendant's expert, who stated that the condition depicted in Plaintiff's Exhibit 11 was not "normal wear and tear."

Cameron insisted, however, that the grain door could not have been damaged at Illinois Grain before his accident. Neither Cameron's testimony nor any other evidence in the record excludes the possibility that the damage occurred during the towing of the barge from Lemont to Illinois Grain; there also was no evidence that Consolidated was negligent in its retention of the towing company. Cameron argues that it is significant that Consolidated presented no evidence showing that the towboat crew inspected the barge because the damage to the grain door would have been discovered had there been such an inspection. This argument is unpersuasive because there is no evidence showing that Consolidated was negligent in failing to require the towboat crew to conduct an inspection so soon after the barge cleaner's inspection. On the other hand, reason indicates that Consolidated's failure to order a post-inspection inspection was not negligent, especially because AW–14 was a virtually new barge.

control of Illinois Grain employees from the night before the accident. He offered only his own testimony to show that the protrusion did not occur after the barge's arrival at Illinois Grain and nothing to show that it did not occur during towing.[16] Absent proof that the inspection was improper or negligent or that the protrusion did not occur during or after the inspection, there simply was no evidence to support a finding of actual or constructive notice. Here the evidence showed only that Consolidated took all reasonable steps to ensure that AW–14 was safe when it arrived at Illinois Grain. Because Cameron's proof was legally insufficient, the judgment appealed from is reversed.

16. Consolidated did not have the burden of proving that the protrusion was caused during that period.