756 F.2d 1161
 James CATES, (Judy Nichols Cates, in her capacity as
Independent Executrix, for substitution in the
Place and Stead of Appellant James Cates
deceased, Plaintiff-Appellant,
v.
INTERNATIONAL TELEPHONE AND TELEGRAPH CORP., et al.,
Defendants-Appellees.
 No. 83-2138.
 United States Court of Appeals,
Fifth Circuit.
 April 8, 1985.
 
 Benton Musslewhite, Houston, Tex., for plaintiff-appellant.
 J. Eugene Clement, Henri Ann Nortman, Houston, Tex., for Stratton, etc.
 William Key Wilde, Mark E. Lowes, Houston, Tex., for all other defendants-appellees.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GARZA, GARWOOD, and HIGGINBOTHAM, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 As presented to the district court, this case primarily involved questions relating to the authority of James Cates ("Cates"), as a partner in two Texas general partnerships, to maintain suit on asserted causes of action belonging to the partnerships. The district court ruled that Cates lacked such authority, and ultimately dismissed the suit. Following the perfection of his appeal and initial briefing, but prior to oral argument in this Court, Cates died, and the parties moved that his widow, Judy Nichols Cates, be substituted, in her capacity as Independent Executrix of Cates' will and estate, as appellant herein in lieu of James Cates, pursuant to Fed.R.App.P. 43(a). We have so ordered. And, for the reasons to be stated, we reverse and remand for further proceedings.
 
 BACKGROUND AND PROCEEDINGS BELOW
 
 2
 An overview of the lengthy and convoluted proceedings in the district court is necessary to an understanding of the issues remaining in the case as we are now called on to dispose of it.
 
 
 3
 Parties, Original Complaint, and Background
 
 
 4
 Cates initially filed this suit in September 1979 on behalf of himself and the two Texas partnerships of which he was a member, SanJac International ("SJI") and SanJac Association ("SJA"), against defendants-appellees ITT Life Insurance Company ("ITT Life") and certain underwriters at Lloyds of London, Ltd. ("Lloyds").[1]
 
 
 5
 SJA and SJI were each created by written agreements among the partners expressly reciting that they thereby formed a general partnership pursuant to Article 6132b, Texas Revised Civil Statutes, the Texas Uniform Partnership Act ("TUPA"). SJI was formed in August 1976, and its partners were Cates, Robert Boyer ("Boyer"), Michael Collins ("Collins"), and G.C. Pettey ("Pettey"), all residents of Texas. Each was a twenty-five percent owner. SJA was formed in 1973, and its partners were Cates, Boyer, and Pettey, each a one-third owner. Pettey is named managing partner in the SJA agreement; the SJI agreement does not refer to a managing partner. Boyer withdrew from both partnerships in January 1959, leaving Cates and Pettey each with a fifty percent partnership interest in SJA, and Cates, Pettey, and Collins each with a one-third partnership interest in SJI.[2] In June 1979, Pettey and Cates, for SJA and SJI, signed a letter reciting that the partnerships employed the attorney who later filed this suit for Cates "in connection with ... dealings with" ITT Life and Lloyds and agreed to pay him a stated percentage "of all recovery." In July 1979, Pettey and Cates signed an agreement amending the SJA partnership and providing that "any action utilizing in any way the partnership," "including, but not limited to, use of name ... or in any other manner whatsoever," would require the "unanimous consent" of its partners. Collins also signed this document, signifying his agreement thereto "in any manner [as] it may affect that certain partnership known as San Jacinto International."
 
 
 6
 The business of SJA and SJI principally related to group life, health, and accident insurance provided through a series of multiple employers' trusts, called American Employers' Group Insurance Trusts, designed to bring the advantages of group insurance to smaller employers. SJA and SJI were involved in the formation and administration of the trusts, the design and marketing of the insurance programs, and administrative matters in connection therewith, including premium collection and claims processing. They were not, however, underwriters or insurers. Originally, the insurer was Old Republic Life Insurance Company, but it withdrew in March or April 1976. ITT Life became the insurer and Lloyds the reinsurer, pursuant to a series of written agreements, effective October 1, 1976, between one or both of the partnerships and ITT Life, between ITT Life and Lloyds, and between the partnerships, ITT Life, and Lloyds. In the agreement between SJA and ITT Life, it was provided in substance that in eleven specified states SJA would perform its marketing of the subject insurance through agents selected by ITT Life. In May 1978, this restriction on SJA's marketing was removed by mutual agreement. The agreements generally provided for cancellation by either party on sixty days' notice, or on termination of the reinsurance. The agreements essentially terminated in January 1979, when the reinsurance expired, Lloyds having given notice in October 1978 that it would not renew. Some administrative functions continued to be performed, such as processing claims from earlier periods. As this activity phased out, the partnerships became largely inactive, though they did not terminate.
 
 
 7
 The thrust of the original complaint was that ITT Life and Lloyds breached their obligations to SJA and SJI under these contracts, and otherwise wrongfully damaged the business of SJA and SJI in reference to the subject matter of the contracts. The principal allegations were that the defendants failed to pay claims promptly, failed to make a good faith effort to market the subject insurance programs in the referenced eleven states "reserved" to ITT Life, and that they entered into the contracts with the fraudulent intent not to perform them in these respects. It was also asserted that defendants unreasonably increased rates on the policies and that, by reason of the way operations were conducted under the agreements, including the provision of one hundred percent reinsurance, the partnerships were forced to perform acts, such as payment of premium taxes and claims, which only a licensed insurance company could lawfully do. Additionally, it was claimed that defendants violated "the Clayton and Sherman Anti-Trust Acts" by the "tie-in" features of the agreements and by attempting to destroy or inhibit the plaintiffs as competition. It is apparent from the face of the complaint, and is otherwise established in the record without dispute, that Cates, individually, was not a party to any of the agreements sued on, and that his only rights in respect to them were those of a partner in the contracting entities, and that he sought recovery, in his name and that of the partnerships, only for the damages sustained by the partnerships.[3]
 
 
 8
 Initial Challenges to Partnerships Being Parties
 
 
 9
 In their answers, ITT Life and Lloyds each alleged, among other things, that the suit was instituted without the authority of SJA and SJI. Cates then engaged in documentary discovery, and took depositions of three executives of defendants in April 1980. Subsequently, in June 1980, Boyer, Collins, and Pettey filed a verified motion to intervene as plaintiffs for the limited purpose of causing the partnerships to be dropped as plaintiffs and enjoining Cates from unauthorized use of the partnership names, and tendered a motion to drop SJA and SJI as parties to the suit. They alleged their respective relationships to the partnerships, stated that the partnerships had not and did not authorize the filing or maintaining of the suit, and that "the filing of such lawsuit in the name of such business entities is not, at this time, in the best interest of such entities."
 
 
 10
 In a reply to this motion, filed in July 1980, Cates took the position that the suit was properly filed because he and Pettey, constituting a majority of the partners in each partnership, had authorized its filing, orally and by the June 1979 letter, and because the partners had "effectually" given Cates "operating authority and responsibility" for the partnerships, and that since the suit was properly instituted, "same cannot be terminated without the unanimous consent of the partners." Cates also alleged that the efforts of Boyer, Pettey, and Collins "to terminate the proceedings insofar as the ... partnership entities are concerned would be equitably tainted since such efforts are solely based upon what they consider to be their own private and personal interests and not the interests of the entities they purport to represent," and that their "expressed sole reservation ... about prosecuting this suit was whether it would have any inimical effects on their future personal business and each confirmed that the ... partnership entities have a viable cause of action in this case." Alternatively, alleging that the partnerships were "virtually insolvent except for the amount of recovery, if any, in this lawsuit" and that he had no other means of protecting his interest, Cates asserted "he should be entitled to bring this suit to protect the loss which he sustained by virtue of his interests in the partnership ... entities."
 
 
 11
 Also, in July 1980, ITT Life filed a lengthy motion in support of the motion to drop parties filed by Pettey, Collins, and Boyer. ITT Life alleged that Cates did not have authority to institute or to maintain suit on behalf of the partnerships, and prayed that the partnerships "be dismissed as parties without prejudice."
 
 
 12
 On August 6, 1980, Cates filed a motion alleging that he had on the same date instituted a suit, "in the nature of a stockholders' derivative suit and minority partners' suit," in state court in Houston against Pettey, Collins, Boyer, SJA, and SJI, "seeking, inter alia, to enjoin the majority partners ... [of SJA and SJI] from attempting to forestall or terminate this lawsuit."[4] In this motion, Cates requested deferral of a hearing on the motion to drop the partnerships as parties until he could procure a ruling on the temporary injunction sought in the state proceeding, asserting that if the federal case were dismissed the "cause of action [therein] could be barred forever by ... limitation or ... laches." The petition in the state suit, copy of which was attached to the motion, alleges that the federal "lawsuit is in the best interests of said ... partnership[s]," that "there is absolutely no bona-fide or justified reason why they [Boyer, Collins, and Pettey] should oppose the bringing of said lawsuit," and that their opposition to it "is willful and malicious." The state suit sought injunctions against interference with the federal suit, as well as actual and punitive damages from Boyer, Collins, and Pettey. It alleged, in support of the requested injunction, that Boyer, Pettey, and Collins were not able to adequately respond in damages.
 
 
 13
 In September 1980, Cates took the depositions of Boyer, Collins, and Pettey, and early the following month again moved to continue hearing on the motion to drop parties, asserting that the temporary injunction in the state court proceedings was to be heard later that month.
 
 
 14
 Meanwhile, on August 11, 1980, the court granted the motion of Boyer, Pettey, and Collins to intervene, but deferred ruling on their motion to dismiss the partnerships.
 
 
 15
 In December 1980, ITT Life filed a counterclaim against Cates, Pettey, Boyer, Collins, SJA, and SJI, alleging in essence that SJA and SJI had misapplied premiums collected for ITT Life under the agreements and had failed to collect and transmit to ITT Life funds for premium taxes, as required by the agreements, in the total amount of approximately $500,000. Cates, Pettey, Boyer, and Collins sought to be held individually liable because they were general partners and guarantors of the performance of SJA and SJI.[5]
 
 
 16
 Then, in February 1981, Boyer, Pettey, and Collins, on behalf of themselves and SJA and SJI, filed as a single document an answer to the counterclaim of ITT Life and a counterclaim against ITT Life for damages suffered by SJA and SJI, urging similar claims to those made in the original complaint filed by Cates. In the answer, the controversy over the representation of SJA and SJI is alleged and it is stated that if, as Boyer, Collins, and Pettey contend, Cates did not have authority to institute or maintain suit for SJA or SJI, then "the aforementioned entities are not before the Court as parties Plaintiff and are not properly before the Court for the purposes of this Counterclaim."
 
 
 17
 Evidentiary Hearing; Partnerships Dismissed in April 1982
 
 
 18
 As a result of an in-chambers conference on October 19, 1981, the court conducted an evidentiary hearing on November 25, 1981 on the question of whether the partnerships should be dismissed as parties in view of the contentions that Cates lacked authority to institute or maintain the suit for or in the name of the partnerships. At the hearing, the court had before it documentary evidence, including the partnership agreements, and heard testimony from Cates, Pettey, Boyer, and Collins, the latter two by deposition.
 
 
 19
 In a brief submitted prior to this hearing, ITT Life advised the court that it had settled with Boyer, Collins, and Pettey. At the hearing, ITT Life's attorney informed the court that Boyer, Pettey, Collins, and Cates had personally guaranteed the obligations of the partnership entities and that ITT Life had settled its claims against Boyer, Pettey, and Collins for cash and notes to be paid by them to ITT Life, the settlement being subject to the court's ruling on whether Cates had authority to maintain the suit on behalf of the partnerships. Pettey, et al., took the position that the settlement was only individual and did not involve any settlement of the rights of SJA or SJI. This was reiterated by ITT Life and by Pettey, et al., in proposed findings and conclusions filed in December 1981, stating that "no settlement or compromise of any claim belonging to" SJI or SJA "has been made."
 
 
 20
 Cates took the position that his institution of the suit had been orally authorized by Pettey and Collins, and was also authorized by the June 1979 letter, as well as his operational control of the major "cost center" of the partnerships. Pettey and Collins disputed this, and urged that the partnerships be dropped. Evidence at the hearing established that neither partnership had been terminated, but both were essentially inactive and practically insolvent (apart from any possible recovery in the present suit). Cates testified he "suppose[d]" he "took responsibility of winding down the [partnership] affairs." Cates argued that since the suit was properly instituted on behalf of the partnerships, the partnership agreements required unanimous consent, which Cates as a partner refused to give, to a voluntary dismissal of the partnership claims.[6] Cates further urged that he be allowed to seek a receiver in state court for the partnerships, in the event it was determined that he, Cates, lacked authority to bring suit for them.[7] As a final alternative, Cates urged that he be allowed "to proceed to collect his loss of partnership interest individually" with "damages ... proportionately reduced to his interest" in the event "we are unsuccessful in keeping those entities in the lawsuit."
 
 
 21
 On April 14, 1982, the court issued a memorandum order dismissing SJA and SJI without prejudice, based on its finding that Cates' suit in their names was filed without authority. The court determined that the June 1979 letter did not grant authority to sue, and that even if it did, Pettey had revoked that authority before the suit was filed. As to SJA, the court ruled that Pettey was the managing partner, that the July 1979 agreement required unanimous consent to an action such as filing suit for the partnership, and that Pettey's consent had not been obtained. As to SJI, the court found that under Texas partnership law and the agreement, the decision of a majority of the partners was necessary, and Collins and Pettey had not consented.
 
 
 22
 August 1982 Dismissal; October 1982 Denial of Reconsideration of April 1982 Order
 
 
 23
 In June 1982, ITT Life and Lloyds each filed motions for summary judgment, asserting that since SJA and SJI had been dismissed Cates had no standing, as he was seeking recovery on the basis of claims that belonged to the partnerships, not to him, and he, as an individual, could not sue for his share, as a partner, of a claim wholly owned by the partnerships.
 
 
 24
 Then, on July 16, 1982, ITT Life and Boyer, Collins, and Pettey, for themselves and for SJA and SJI, filed a joint motion to dismiss with prejudice both the counterclaim of ITT Life against Boyer, Collins, Pettey, SJA, and SJI, and the counterclaim (i.e., that filed in February 1981) of Boyer, Collins, Pettey, SJA, and SJI against ITT Life.
 
 
 25
 Cates, on August 5, 1982, filed a response to the summary judgment motions of ITT Life and Lloyds. He urged that the partnerships were, or should be, still in the suit because the court's April 14, 1982 order had only determined that Cates did not have authority to file the suit on behalf of the partnerships. After the suit was filed, Cates contended, the partnerships otherwise became parties to the case by reason of ITT Life's counterclaim, and the counterclaim in response thereto filed by Pettey, Collins, Boyer, SJA, and SJI, particularly as this was filed after Pettey, Collins, and Boyer had withdrawn their motion to drop parties.[8] Accordingly, Cates urged that Pettey, Collins, and Boyer were prevented by estoppel and waiver from contending that SJA and SJI were not parties to the case, and also that, since SJA and SJI had properly become parties to the case, unanimous partner action was necessary for any decision on the part of such entities to cease being parties, or, if a majority decision were permissible, it was lacking at least as to SJA. Cates asserted that any settlement by the partnerships with ITT Life was invalid if it released partnership claims, since it did not have his consent and hence violated the partnership agreements (see note 6, supra ). As to which attorney could represent the partnerships, Cates said the court could appoint counsel.
 
 
 26
 This response of Cates to the June 1982 summary judgment motions also called attention to his first amended complaint, which he had recently tendered for filing[9] and in which he sought to make Pettey, Collins, and Boyer defendants, as well as ITT Life and Lloyds, alleging that those individuals had conspired with the corporate defendants, "from the inception, and all through the existence of the employers trusts, to and through the institution and the present continuation of this lawsuit." This complaint had as party-plaintiffs not only Cates, but also SJA and SJI. Alternatively to the partnerships asserting their causes of action, the tendered amended complaint also sought to assert on behalf of Cates his share, as partner, of such causes of action. Referring to these allegations, Cates' response to the summary judgment motions noted that "the Defendants have cited cases that hold that ... a partner cannot as a shareholder in a corporation can, sue derivatively to assert ... claims on behalf of the partnership," and asserted that "if ... the Plaintiff cannot bring [a] derivative suit, as he could if he were a shareholder in a corporation," then Cates should be allowed to "assert a cause of action for the damages to himself, being the loss of his interest in the partnerships, or the loss of the profits he sustains by reason of the same conduct which would be the basis of the cause of action by the partnership."[10]
 
 
 27
 By its order of August 9, 1982, the court granted the July 16, 1982 joint motion to dismiss of ITT Life, SJI, SJA, Boyer, Collins, and Pettey, and dismissed with prejudice, both the ITT Life counterclaim, except as to Cates, and the "Counterclaim" of Collins, Boyer, Pettey, SJA, and SJI against ITT Life.
 
 
 28
 Then Cates, in August 1982, filed supplemental oppositions to the June 1982 motions for summary judgment and a motion "to vacate order of court dismissing" SJA and SJI. In these papers, Cates again took the position that the unanimous consent of all partners was required for any release or settlement of partnership claims, and that the court's orders of April 14 and August 9, 1982 should therefore be vacated.[11] Cates further urged that any general partner had the right to institute suit on behalf of the partnership, and that in any event such authority could not be challenged where all the other partners were before the court, whether as plaintiffs or defendants, since in that event the rights of all parties would be protected. Alternatively, Cates requested that the court
 
 
 29
 "... [d]efer any further action in this matter until Mr. Cates can effectuate withdrawal from the partnership ... and thence continue this action in his name only ... for the value of his partitioned assets (such as his partition of the lawsuit against ITT by the partnership), assets of course including ... contingent receivables and causes of action."
 
 
 30
 In its September 2, 1982 response to Cates' motion to vacate, ITT Life stated that
 
 
 31
 "... [a]fter the [April 14, 1982] dismissal of the [SJA and SJI] entities as parties, the remaining Intervenors, Boyer, Collins and Pettey, as individuals, reached a settlement of their own liability and claims with the defendant ITT Life. This settlement and dismissal was approved by the Court on August 9, 1982.... [U]nder the partnership agreements unanimous consent is only required to compromise or settle a partnership claim or debt. See, Art. 5.2 of the Partnership Agreements. No settlement or compromise on behalf of the partnerships has been made.... Accordingly, there is no error in the Court's order dismissing the entities or in the Court's Order of August 9, 1982 dismissing the remaining Intervenors, Boyer, Collins and Pettey."
 
 
 32
 This statement is inexplicable, since the August 9, 1982 order expressly dismissed, with prejudice, the counterclaims of SJA and SJI against ITT Life.[12]
 
 
 33
 After hearing oral argument, the district court, on October 26, 1982, issued a further memorandum order. It overruled Cates' motion to vacate, treating it as being directed only to the April 14, 1982 order, and in effect ignoring the August 9, 1982 order. The court's refusal to vacate its April 1982 order was based entirely on the view that "[i]t has long been held in Texas that a partner cannot maintain in his own name an action based on a partnership contract." It did not address any factual or legal issues related to the claimed wrongdoing of Pettey, Collins, or Boyer, or whether such matters would authorize Cates to sue for the partnerships, derivatively or otherwise, or to sue for his interest in the partnership claims. The court then ruled that Cates would be allowed to amend his original complaint to assert "what individual causes of actions he may have against the defendants." However, it directed that Cates could not "add Boyer, Pettey, or Collins as defendants" because
 
 
 34
 "... plaintiff has been afforded that opportunity in state court. Plaintiff has admitted that he has instituted suit against these three persons in state court, suing them for alleged collusion with the ITT defendants as well as certain underwriters of Lloyds.... Accordingly, ... plaintiff will have his day in court against his former partners ...."
 
 
 35
 The court also determined that, since its April 14, 1982 order would not be vacated, "any mention of" SJA and SJI "as plaintiffs is prohibited in the amended complaint." Because an amended complaint would be filed, the court did not rule on the pending motions for summary judgment.[13]Second Amended Complaint; February 1983 Final Dismissal
 
 
 36
 In response to the court's October 26, 1982 order, Cates, on December 16, 1982, moved for leave to file a tendered second amended complaint. In this complaint, Cates was the sole plaintiff and ITT Life and Lloyds were the sole defendants. Cates alleged that he "is ... [a] general partner in" SJA and SJI, which are "both partnerships." The complaint generally averred the same contracts, and the same wrongs in relation thereto, as were alleged in the original complaint. However, these agreements are referred to, in conclusory fashion, as ones which were entered into by "SJA, SJI ... and Cates ... with ITT Life ...." It was averred that "the total loss of the profits and other damages to SJA and SJI is a total of $49.6 million,"[14] which Cates sought to recover in its entirety, or alternatively, seventy percent thereof, alleging "while his partnership interest in one partnership was 40% and in the other partnership 50%, by reason of the complicated system of determining profits internally within said partnerships, the facts will show that he effectively was entitled to 70% of the profits." Additional damages alleged were $900,000 per year "loss of salary and bonuses," past and future, $13.5 million[15]; "loss of prospective advantages or ability to enhance his position in the insurance industry and to engage in other related type enterprises," past and future, $7.5 million; mental anguish, past and future, $3.75 million; plus "no less than $50 million" punitive damages.[16]
 
 
 37
 This complaint alleged that Cates was "either a substantial (one third or greater), equal or controlling partner ... in SJA and SJI" and that "they were his alter ego ... and any rights accruing to them accrued to him as their alter ego." Allegations concerning the other SJA and SJI partners included the following:
 
 
 38
 "... Despite the fact that he was responsible for putting together the San Jac entities [SJA and SJI], creating the various employers trusts and generating 90% of these entities' income, for reasons which now seem inexplicable to him, he did agree to give away substantial interests to Boyer, Pettey and Collins. Although they had been given a percentage of interest in the various partnerships, and participation in salaries and profits far beyond their value and worth, they rewarded Cates with their disloyalty and with their desire and intention from the inception, and all through inducing the termination and breach of the various contracts and business relationships mentioned above were a proximate cause of the damages all as hereinafter alleged.
 
 
 39
 "....
 
 
 40
 "... [A]ll Defendants, acting in concert with Boyer, Pettey and Collins, have tortiously attempted to and are now interfering with and obstructing the efforts of the Plaintiff to have his day in Court and to seek justice."
 
 
 41
 The complaint also alleged a "conspiracy between Boyer, Pettey and Collins and the Defendants ITT Life and the Lloyd's [sic ] Defendants" apparently existing before the suit was filed, and that ITT Life's wrongdoing was accomplished "through the assistance of Boyer, Pettey and Collins." Wrongful obtaining of trade secrets and disparagement of Cates' ability to perform as an insurance executive were asserted in this connection.
 
 
 42
 Additionally, this complaint charged that defendants maliciously conspired "to squeeze out SJA, SJC [San Jacinto Corporation], SJI and Cates from the insurance industry," and that "since the destruction of SJA, SJC, SJI and Cates as viable business entities" defendants have "boycotted Cates in the insurance industry, thus further damaging and injuring him."
 
 
 43
 ITT Life and Lloyds opposed Cates' motion for leave to file his second amended complaint, and filed further motions for summary judgment. They took the position that the second amended complaint was tendered too late. They also urged that it failed to state an individual or personal cause of action on behalf of Cates, and objected to the vague and conclusory nature of the allegations in the complaint. Defendants asserted that "the undisputed facts are that all the contracts were between the San Jac entities [SJA, SJI, and SJC] and the defendants," that all causes of action in relation to the subject matter of those contracts belonged to the partnerships, and that the court's previous ruling established that Cates could not sue on behalf of the partnerships. Otherwise, the motions for summary judgment were not based on matters outside the pleadings or on claims of undisputed facts, but merely on the assertion that as a matter of law a partner had no standing to sue for injuries to the partnerships. ITT Life urged that "[u]nable to sue for the entities, plaintiff has attempted to create a derivative cause of action on his own behalf." However, no summary judgment "evidence" was adduced in response to Cates' allegations that his partners conspired with the defendants against him, or to establish that Cates was not directly harmed by defendants' alleged conduct in ways unrelated to his interest in, and employment by, the partnerships and the businesses they conducted.
 
 
 44
 The court made its final ruling in February 1983, following a nonevidentiary hearing in January. It allowed the second amended original complaint to be filed, but granted the motions for summary judgment. However, except as it relied on its previous rulings, the latter determination was not based on any summary judgment evidence, but was grounded entirely on the court's perception that the second amended original complaint stated no cause of action for which Cates individually had standing to sue.[17] The court did not address Cate's allegations of conspiracy between his partners and the defendants. Nor did it assess the allegations in the complaint relating to Cates' injuries in respects arguably not related to the business or contracts of SJA and SJI.
 
 
 45
 The court then granted the motions for summary judgment and ruled that "[a]ccordingly, all remaining aspects of this case are hereby dismissed with prejudice." This appeal followed.
 
 DISCUSSION
 Certain Contentions Mooted
 
 46
 Cates' principal arguments are directed to the issues which the district court initially addressed in its April 1982 order and its October 1982 refusal to vacate the April order.[18] Cates presents two main contentions in this respect:
 
 
 47
 (1) that he, as a general partner, was in fact authorized to file the suit by the only other partner in SJA and by at least two of the three equal partners in SJI, or that at least the other partners were estopped to contend otherwise and waived their right to do so by initially acquiescing in the filing of the suit and by subsequently filing a counterclaim therein against ITT Life; and that since the suit was properly filed by the partnerships, the concurrence of all partners, lacking as to both SJA and SJI, was required for the partnerships to withdraw the suit, or, at the least, the concurrence of a majority of the partners, lacking as to SJA, was required; and
 
 
 48
 (2) that Cates, as a partner in each partnership, was authorized to bring and maintain suit in the name of the partnerships on the partnership causes of action, without the consent of the other partners, because the suit concerned a phase of the partnership business as to which Cates acted as managing partner, and because any general partner normally has authority to cause suit to be brought by the partnership in its name or at least has such authority where, as here, the other partners are eventually made parties, either as plaintiffs or defendants, or where, also as here, the partnership is in dissolution.[19]
 
 
 49
 All these contentions are rendered moot by Cates' death. Cates has conceded, as he must, that a cause of action accruing to a partnership is partnership property, both generally and within the meaning of the TUPA, Article 6132b, Texas Revised Civil Statutes.[20] This is as true of a cause of action for violation of the federal antitrust laws as it is for any other cause of action. Coast v. Hunt Oil Co., 195 F.2d 870 (5th Cir.), cert. denied, 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651 (1952); Hauer v. Bankers Trust New York Corporation, 65 F.R.D. 1 (E.D.Wisc.1974).
 
 
 50
 It is clear that on the death of a partner, his heirs, legatees, or personal representatives do not succeed to any of his rights respecting specific partnership property, nor to any of his managerial rights respecting the partnership and its property. Section 28-B(1)(B) of the TUPA provides that:
 
 
 51
 "On the death of a partner, such partner's surviving spouse (if any) and such partner's heirs, legatees or personal representative, shall to the extent of their respective interests in the partnership, be regarded for purposes of this Act as assignees and purchasers of such interests from such partner."[21]
 
 
 52
 Section 27(1) states that an assignment of a partner's interest does not
 
 
 53
 "entitle the assignee, during the continuation of the partnership, to interfere in the management or administration of the partnership business or affairs."
 
 
 54
 Similarly, Section 25(2)(d) provides that "[o]n the death of a partner his right in specific partnership property vests in the surviving partner or partners, except where the deceased was the last surviving partner, when his right in such property vests in his legal representative." Thus, the widow, heirs, legatees, or personal representatives of a deceased partner have neither any interest in or right to possess specific partnership property nor any right to the management or administration of partnership affairs, all such interests and rights vesting in the remaining partner or partners. Accordingly, even if any or all of the above-described contentions of Cates are well taken, a point we do not decide, nevertheless, his widow and executrix, Mrs. Cates, would not, merely by reason of any or all such matters, be able to maintain suit on the partnership causes of action.
 
 
 55
 Mrs. Cates, however, urges that the situation is otherwise because, although neither partnership had terminated, "the partnerships were not only in dissolution, but ... Cates took charge of the winding-up process and thus had the right to institute suits or take other steps to complete the winding-up process." Mrs. Cates expressly recognizes that the partnerships have not terminated, and she quotes in her brief the language from Crane & Bromberg, Partnership (1968), defining dissolution, termination, and winding up.[22] She contends that where a partnership is in dissolution and the partner conducting the winding-up process dies, that the right to complete the winding up passes to the deceased partner's personal representative. That is true, however, only with respect to the death of the last surviving partner. At his death, Cates was not the last surviving partner in either SJA or SJI. As previously noted, under section 25(2)(d) the rights of a deceased partner to specific partnership property vest "in the surviving partner" and not in the deceased partner's personal representative, except only "where the deceased was the last surviving partner." And, section 37 provides that "the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs."[23] In the commentary to section 37 of the TUPA, Professor Alan R. Bromberg states:
 
 
 56
 "In giving the surviving partners authority to wind up, Sec. 37 is buttressed by Sec. 25(2)(d) which gives them all the rights of a deceased partner in specific partnership property. Thus, partnership assets are not subject to administration in the estate of a deceased partner (unless he was the last)."We believe the applicable Texas law on this point is correctly summarized in Crane & Bromberg, supra, as follows:
 
 
 57
 "At common law the surviving partner succeeds to the title to partnership property and has the right and duty to wind up the partnership affairs.
 
 
 58
 "....
 
 
 59
 "The surviving partner, at common law, has the right to continue to administer the partnership affairs so long as he acts honestly and with due diligence. On the death of the last surviving partner, the right to take over partnership property and to finish winding up passes to his representative. If the surviving partner is not acting diligently and in good faith, the court may, on petition of the representative of the deceased partner's estate, appoint a receiver. The U.P.A. [Uniform Partnership Act] substantially codifies all the rules stated in this paragraph, as well as the duty of a surviving partner to wind up and account for the interest of the decedent." Id. at 469-70 (footnotes omitted).[24]
 
 
 60
 Consequently, we do not resolve the foregoing issues, which constitute the bulk of those raised by Cates in his appeal, because a decision of any or all of them in his favor would not inure to the benefit of his personal representative, for if the case is remanded, she will not in any event have the right to pursue it on the basis of any of the foregoing theories on which Cates predicated his right to bring and maintain the suit on behalf of the partnerships.
 
 August 1982 Dismissal Erroneous
 
 61
 This is not to say, however, that Mrs. Cates has no interest in the partnerships. Under section 27(2) of the TUPA, she is entitled to receive Cates' partnership interests when the dissolution is complete. For the reasons hereinafter stated, we have concluded that the dismissal of the partnership claims must be remanded to the district court to determine whether sufficiently exceptional circumstances exist so that Mrs. Cates should be allowed to prosecute the partnership causes of action, or so that the case should be held in abeyance pending either appointment of a receiver to prosecute those claims or the completion of partnership dissolution in which Mrs. Cates might receive a fractional interest in the partnership causes of action. In this context, to leave outstanding the August 9, 1982 order granting the joint motion, predicated on settlement, to dismiss with prejudice the counterclaims of SJA and SJI against ITT Life, might render our remand for such purposes wholly ineffectual. We note in this connection that the partnership agreements prevented any "release or compromise [of] any ... claim of the Partnership, except for full payment" without the unanimous consent of all the partners (see note 6, supra ), that then partner Cates did not consent to the settlement, and that ITT Life has not defended this aspect of the August 1982 order on appeal, but has rather characterized the situation as one in which the partnership claims were not compromised and the dismissal as to the partnerships was only without prejudice (see notes 11 and 12 and accompanying text, supra ). We also observe that the district court made no ruling or determination that the settlement on which the August 9, 1982 order was based, so far as it involved release of the partnership claims against ITT Life, was for "full payment" or was otherwise reasonable, and indeed there was no evidence whether or not such was the case. Accordingly, the district court erred in its August 1982 dismissal with prejudice of the counterclaims of SJA and SJI against ITT Life. Because all the dismissals accomplished by the August 9, 1982 order appear interrelated, the entire said order is set aside; and those matters are remanded to the district court for further proceedings in connection with the remand of other aspects of this case as described below. Cf. Kicklighter v. Nails by Jannee, Inc., 616 F.2d 734, 744 (5th Cir.1980).
 
 Derivative Action and Related Remedies
 
 62
 As previously indicated, we think it clear that a partnership cause of action belongs to and is the specific property of the partnership, and that one merely owning an interest in the partnership may not, absent exceptional circumstances, bring suit either on such a cause of action as a whole, whether in the name of the partnership or in his own name, or for the fractional share of such a cause of action corresponding to his fractional interest in the partnership. Indeed, the general rule seems to be that even a single partner, at least absent the consent of a majority of the partners, may not ordinarily do so. Coast v. Hunt Oil Co., supra; Hauer v. Bankers Trust New York Corporation, supra; Stevens v. St. Joseph's Hospital, 52 A.D.2d 722, 381 N.Y.S.2d 927 (1976); Godwin v. Vinson, 251 N.C. 326, 111 S.E.2d 180 (1959); Zion v. Sentry Safety Control Corporation, 258 F.2d 31, 34 (3d Cir.1958); Heinz v. Simon & Flynn, Inc., 444 F.Supp. 114, 117 (S.D.N.Y.1978). Prior to the adoption of the TUPA in 1961, it was stated that under Texas law "the general rule is that, in suits by partnerships, all partners must be plaintiffs, and, where one partner refuses to join, he should be made a party defendant." Howell v. Bartlett, 19 S.W.2d 104, 105 (Tex.Civ.App.--Amarillo 1929, no writ). The same rule has been applied in Texas after the TUPA, though without stating how the TUPA might affect it. See Spiritas v. Rabinowitz, 544 S.W.2d 710, 715 (Tex.Civ.App.--Dallas 1976, writ ref'd n.r.e.). We have doubts whether application of this rule so as to generally authorize suit by a minority partner on a partnership cause of action comports with the strong "entity" bias of the TUPA.[25] In any event, it seems plain that whatever power a single partner generally has to bring suit on a partnership cause of action must, under the TUPA, rest either on his section 18(1)(e) "equal rights in the management," or on his section 25(1) co-ownership of specific partnership property and section 25(2)(a) "equal right with his partners to possess specific partnership property for partnership purposes," or on some combination of these. As we have observed, no such ownership or rights vest in the surviving spouse, heir, legatee, or personal representative of a deceased partner who was not the last surviving partner. Accordingly, it is evident that in the ordinary situation, Mrs. Cates could not bring or maintain suit, either in her own name or in the names of SJA or SJI, on any cause of action belonging to either partnership or for the fractional interest in any such cause of action corresponding to Cates' fractional interest in the partnership.[26]
 
 
 63
 However, the record reflects that this case does not necessarily present the ordinary situation with respect to the rules previously discussed. These unusual aspects of the case were not expressly addressed by the district court.
 
 
 64
 In his opposition to the motion of Boyer, Pettey, and Collins to drop the partnerships as parties, Cates took the position that the other partners were motivated entirely by personal considerations unrelated to the interests of the partnerships. He urged that they were not able to adequately respond in damages. In his tendered first amended complaint and in his second amended complaint, Cates alleged that his partners had conspired with defendants ITT Life and Lloyds in committing at least some of the wrongs alleged as partnership causes of action, and further, that these partners had also conspired with the defendants to prevent the suit being brought or maintained by the partnerships. While Cates did not use the words "derivative action" in urging that he be allowed to sue on behalf of the partnerships, the defendants, in one or two of their submissions below, so characterized his approach. However, none of the hearings below focused on these matters, nor did the district court expressly address them in its rulings. Further, Cates also requested, if it were determined that he did not have authority to maintain the suits for the partnerships, that the court hold the actions in abeyance until he could have a receiver appointed for the partnerships in the state court proceeding or procure a complete winding up of the partnerships so he could individually receive his share of the partnership causes of action against the defendants. The district court did not expressly address these requests.
 
 
 65
 We believe that under Texas law, one in Mrs. Cates' position[27] is not necessarily confined to an accounting action against the partners in the event that they, for improper, ulterior motives and not because of what they in good faith believe to be the best interests of the partnership, determine not to pursue a valid and valuable partnership cause of action. We suggested as much in Coast v. Hunt Oil Co., 195 F.2d at 872:
 
 
 66
 "There is no allegation in the complaint that Querbes [the majority partner] was guilty of any fraud or misconduct or, except by inference, that he was even unwise in refusing to consent to the bringing of this action by the partnership. There are no grounds for the Court to interfere with the management of the entity, and to authorize this suit to be maintained in its behalf either by a receiver,[3] or by one of the partners.[4]
 
 
 67
 The reference in Coast's footnote 4 to United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917), clearly suggests a derivative action. Of course, Coast applied Louisiana law, but we are not convinced that Texas law would be different in such an instance. Other jurisdictions have recognized derivative actions in the partnership context. See Riviera Congress Associates v. Yassky, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (N.Y.Ct.App.1966) (derivative suit by limited partners on behalf of partnership); Klebanow v. New York Produce Exchange, 344 F.2d 294 (2d Cir.1965). Cf. Thompson Door Co., Inc. v. Haven Fund, 351 A.2d 864 (Del.Sup.Ct.1976). The availability of a derivative action is also suggested by Professor Bromberg's statement that a partnership interest under the TUPA "is fairly analogous to a share of stock in a corporation or a beneficial interest in a trust" (see note 24, supra ). In an appropriate case, of course, a shareholder may bring a derivative suit on behalf of the corporation. See 15 Tex.Jur.3d Corporations Sec. 166. Similarly, it has long been the rule that a beneficiary may sue to enforce a claim of the trust when the trustee wrongfully refuses to do so. See Klebanow, supra, at 297; Restatement (Second) of Trusts Sec. 282(2).
 
 
 68
 The court in Hauer rejected the theory of a minority partner's derivative suit because the relevant state statutes expressly provided for such in the corporate context, but were silent as to partnerships. Id. 65 F.R.D. at 4. Although we have found no Texas decision in point, we are not prepared to say that the Texas courts would follow this approach.[28] To begin with, historically the stockholders' derivative action was an equitable remedy devised by the courts, not a statutory one. See 13 Fletcher Cyc Corp Secs. 5940, 5941.1, 5942. While it is now regulated to some degree by statute in Texas, see Texas Business Corporation Act, Article 5.14, its roots in Texas law are prestatutory. See 15 Tex.Jur.3d Corporations Sec. 166; Schwartz v. Mims, 40 S.W.2d 853, 854 (Tex.Civ.App.--San Antonio 1931, writ dism'd). Moreover, Hauer itself seemingly recognizes that a partner's derivative action might be maintainable in some situations. Id. 65 F.R.D. at 3 (citing Klebanow). Finally, the Hauer analysis does not address the trust analogy.
 
 
 69
 We do not hold that Texas law would necessarily allow a derivative action on the part of a minority partner or an owner of a partnership interest. What we do hold is that in a proper case--one where the controlling partners, for improper, ulterior motives and not because of what they in good faith believe to be the best interests of the partnership, decline to sue on a valid, valuable partnership cause of action which it is advantageous to the partnership to pursue--Texas law would afford some remedy to the minority partner or partnership interest owner other than merely a damage or accounting suit against the controlling partners, at least where the latter would not be reasonably effective to protect the substantial rights of the minority. "If the law were otherwise, valuable rights might be lost by failure to sue (for example) within a statutory period...." Thompson Door Co., Inc. v. Haven Fund, 351 A.2d at 865. As noted, one such remedy might be a derivative action--allowing suit by the minority partner or partnership interest owner on the partnership cause of action, for the benefit of the partnership. Another possible remedy would be to allow the appointment of a receiver for the partnership. As noted in Crane & Bromberg, supra, with respect to dissolution on the death of a partner, "if the surviving partner is not acting diligently and in good faith, the court may, on petition of the representative of the deceased partner's estate, appoint a receiver." Id. at 470. See also TUPA Secs. 32(1)(c), (d), & (f) (court may order dissolution); Sec. 37 ("... any partner, his legal representative or his assignee, upon cause shown, may obtain winding up by the court"). Where limitations or similar timing problems require legal action before a receiver can be appointed, it may be necessary, in an appropriate case, to allow the minority partner or interest owner to file the suit and to hold it in abeyance pending action on the receivership application.[29] Finally, the minority partner or interest owner might be allowed to sue for his or her appropriate fraction of the partnership cause of action. Something like this is suggested in the pre-TUPA case of Storrie v. Fort Worth Stockyards, 143 S.W. 286, 291 (Tex.Civ.App.--Fort Worth 1911, no writ).[30] In any actions of this kind, we assume that generally all partners would at least initially be made parties.
 
 
 70
 We do not define precisely what kind of impropriety will authorize a minority partner or interest owner to maintain a derivative suit, or to have other alternative relief such as outlined above. It is sufficient for the present case to say that such would be authorized at least where the controlling nonconsenting partners have conspired with the defendant third party in committing some material part of the wrongs complained of and have, in bad faith for their own personal interests and not with a view to the best interests of the partnerships, colluded with the third party to prevent the suit. At the other end of the spectrum, we do not suggest that these remedies are available to invade the good faith managerial business judgment of the controlling partners, despite the fact that the court might disagree with such judgment or even view it as not being entirely reasonable.[31] And, we recognize in this respect that consideration by the controlling partners of the possibility that the partnership would be exposed to a countersuit by the defendant third party, for which, if successful, all who were partners would ultimately have personal liability either as guarantors of the partnership or by virtue of being (or having been) general partners, is not itself an improper or wrongfully ulterior motivation for a decision by the controlling partners to dismiss the suit of the partnership or to effectuate a settlement thereof with the defendant.
 
 
 71
 We are, of course, governed by the rule that pleadings are to be construed with great liberality when there has been a dismissal on the merits for failure to state a claim. Such a dismissal is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). And, in this connection, a deficiency in "recitation of formulas" will not normally justify the dismissal. Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 601 (5th Cir.1981). In its 1983 dismissal of Cates' suit, the district court, although it formally ruled on defendants' motions for summary judgment, based the dismissal on the conclusion that Cates had failed to state a claim, and on its April and October 1982 orders. The district court did not on any of these occasions address Cates' allegations that Petty, Collins, and Boyer had wrongfully conspired and colluded with the defendants, and that they were acting from improper, ulterior motives in seeking to terminate the suit by the partnerships. The district court did observe that Cates had his state court suit against Pettey, Collins, and Boyer. However, that observation did not relate to the effect of the referenced allegations by Cates on Cates' ability to bring suit on the partnership causes of action, either as a whole or for his fractional interest therein. Nor did the court below address Cates' requests that in the event it ruled he did not have authority to sue on behalf of the partnerships, the case be held in abeyance until the state court could act on his application for a receiver or winding up could be completed. We accordingly reverse the district court's judgment dismissing Cates' suit (so far as it sought to recover on partnership claims) and the suit of the partnerships, and remand those matters to the district court so that it may address the effect of Cates' referenced allegations (that his partners wrongfully conspired with the defendants and acted out of collusion with them, from improper and ulterior motives and not in an effort to further the best interests of the partnerships) on his right to maintain the suit on the partnership causes of action, either derivatively in the name of the partnerships, or for his percentage of such claims, or alternatively to have action on the case deferred until a receivership application could be acted on in his state court suit or the partnerships' winding up could be completed.
 
 
 72
 In this connection, we recognize that Cates' pleadings and motions were extremely conclusory, confused, and unclear. They would appear not to comply either with the requirements that pleadings contain "a short and plain statement of the claim" and "be simple, concise and direct," Fed.R.Civ.P. 8(a) & (e)(1), or with the requirements that allegations of fraud and circumstances constituting fraud "shall be stated with particularity" and that items of special damages "shall be specifically stated," Fed.R.Civ.P. 9(b) & (g). They were doubtless subject to motions for more definite statement under Fed.R.Civ.P. 12(e), and perhaps to motions to strike under Fed.R.Civ.P. 12(f). But such deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances. In any event, those considerations were not an articulated basis of the district court's actions. We likewise recognize that it is perhaps arguable that Cates unduly delayed seeking a receivership or a forced completion of dissolution in state court.[32] Again, however, this was not addressed by the district court. And our reversal and remand does not imply that the district court need countenance improper pleading, or that, when made properly specific, Cates' allegations may not reveal an absence of any basis for a derivative-type remedy or similar relief. Cf. Klebanow, 344 F.2d at 299-300. Nor do we imply that Cates' referenced allegations of conspiracy and impropriety on the part of his partners may not be "pierced" by summary judgment motions grounded in adequate summary judgment "evidence."
 
 Individual Claims
 
 73
 We turn at long last to the final question presented, namely, whether the dismissal was proper insofar as it related to the claims Cates purported to assert as individual claims distinct from the partnership causes of action. As we have already observed, the record conclusively shows that the agreements sued on were between the partnerships and the defendants, that Cates individually was not a party thereto, and that the businesses which were the subject matter of the agreements were the businesses of the partnerships, not of Cates individually. Accordingly, any claims for damages which Cates suffered by reason of diminution in value of his partnership interest, or his share of partnership income, or his salary or bonus from the partnerships or their businesses, by reason of breach of such agreements, or tortious interference with such businesses, or anticompetitive conduct interfering with or limiting or "taking over" such businesses or their activities, are in effect subsumed within the causes of action of the partnerships[33] and do not afford Cates (or his legal representative) a separate, individual cause of action. This is also true with respect to loss of business reputation or good will flowing from damage to or failure of the partnership businesses, and with respect to loss of opportunity for future advancement in the insurance industry generally, resulting from damage to the partnership businesses that might otherwise have afforded Cates, as a partner therein, a wider scope or more prestige or the like. See Coast; Hauer v. Bankers Trust New York Corp., 509 F.Supp. 168, 174-76 (E.D.Wisc.1981). The applicable rule in this respect is stated in our decision in Martens v. Barrett, 245 F.2d 844, 846 (5th Cir.1957):
 
 
 74
 "... [I]t is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership." (Footnotes omitted.)
 
 
 75
 We reapproved this same language in Schaffer v. Universal Rundle Corporation, 397 F.2d 893, 896-97 (5th Cir.1968) (Texas law and federal antitrust law; "good will and business reputation ... of ... [owner] as an individual"), and again in Mendenhall v. Fleming Company, Inc., 504 F.2d 879, 881 (5th Cir.1974). Schaffer was reaffirmed in McDonald v. Bennett, 674 F.2d 1080, 1086 (5th Cir.1982) (Texas law). See also Pitchford v. Pepi, Inc., 531 F.2d 92, 97 (3d Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976) (corporate officer).
 
 
 76
 These authorities make it plain that the vast majority of the claims sought to be asserted in Cates' second amended complaint were partnership, not individual claims. Obviously, this is true with respect to the $49.6 million of claimed damages of SJA and SJI (see notes 14 & 15 and accompanying text, supra). This would also be true as to the loss of partnership salary and bonus, as well as loss of prospective advantages or ability to enhance position in the insurance industry, so far as these flowed from damage or legal injuries to the partnerships or their businesses (see note 15 and text at notes 15 & 16, supra).[34]
 
 
 77
 However, there are other allegations which are not so clearly assertions of partnership claims. For example, Cates' second amended complaint alleges that after destruction of the partnership businesses, defendants "boycotted Cates in the insurance industry, thus further damaging and injuring him." Language in the second amended complaint can also be read as charging that there was an effort to drive Cates individually out of the insurance business and to disparage his personal abilities as an insurance executive which was not simply a part and consequence of the similar alleged wrongs against the partnerships and their businesses. The allegations of conspiracy among the defendants and Boyer, Collins, and Pettey likewise may suggest a wrongful interference with Cates' relations with the partnerships as such.[35] The district court did not expressly address any of such allegations, and neither did the motions for summary judgment. Our attention has not been directed to any summary judgment evidence conclusively refuting them. As noted, the district court in essence held that the complaint did not state any individual claim. However, because of the presence of these last-referenced claims, we cannot say that it appears beyond doubt that Cates could prove no set of facts in support of any truly individual claim made in his second amended complaint which would entitle him to relief. Therefore, we reverse and remand the district court's ruling dismissing Cates' suit for failure to state any individual claim.
 
 
 78
 Again, we realize that Cates' second amended complaint is so general, conclusory, and confused, and that allegations therein which might arguably state individual claims are so intermingled with, and undifferentiated from, those which are plainly the statement of partnership claims, that it is most difficult, if not almost impossible, to precisely identify what individual claims are stated or to adequately address their validity on the merits. Clearly, the second amended complaint is defective as a matter of form. But, as we have stated, such defects do not normally warrant a dismissal of the suit on the merits, with prejudice; nor was the form of the complaint a basis for the ruling below. Such matters can be addressed on remand. And we do not suggest, of course, that a complaint in proper form may not reflect the absence of any individual, as distinguished from partnership, claim[36]; nor that any such individual claim may not be defeated by a proper motion for summary judgment, supported by appropriate summary judgment evidence.
 
 CONCLUSION
 
 79
 We conclude with a general summary. We have ruled that causes of action for breach of the agreements and for interference with, or restraint of, the partnership businesses are partnership causes of action, and that a separate, individual action on behalf of Cates or Mrs. Cates in respect thereto does not exist. This likewise applies to loss of value of partnership interest, loss of income therefrom, loss of partnership salary or bonus, and also to damage to reputation or prospective advantage, flowing from damage to or failure of the partnership businesses. We have further ruled, however, that Cates' allegations are not clearly confined to such partnership claims, and also appear to assert separate, individual claims. The district court will address this on remand. With respect to the partnership claims, Mrs. Cates, who is not a partner but merely the owner of an interest in the partnerships, has no authority or standing (individually or as Cates' executrix) to assert any of these claims, unless she meets the special requirements, which we have generally outlined, for a partnership derivative suit or for comparable extraordinary relief, such as being allowed to sue for her fractional part of the partnership claims, or having the suit delayed until a receiver is appointed for the partnerships, or their dissolution is completed. The district court will address on remand whether Mrs. Cates meets these special requirements. We do not pass on the form or timeliness of the pleadings or requests for relief, nor on the merits of claims which may be asserted. Again, these are matters for the district court, in the first instance, on remand.
 
 
 80
 We grant the motion to substitute Mrs. Cates, in her capacity as Independent Executrix of the will and estate of James Cates, deceased, as appellant herein in lieu of James Cates. We set aside the order of August 9, 1982, the orders dismissing SJA and SJI as parties, and the February 1983 order dismissing Cates' suit, and remand these matters to the district court for further proceedings not inconsistent herewith.
 
 
 81
 REVERSED and REMANDED.
 
 
 
 [1]
 This is an unavoidable oversimplification. To begin with, San Jacinto Corporation, a Texas corporation, the stockholders, officers, and directors of which were the four SJI partners, was also initially named a plaintiff. With the consent of all parties, it was dismissed without prejudice, and no complaint in regard to it is made on appeal. Also, the suit initially named "Lloyds of London, Ltd." as a party-defendant; this designation was abandoned and in lieu thereof "Albert J. Stratton, on behalf of himself and certain other underwriters of Lloyds" were made defendants; for convenience, we refer to all these parties simply as "Lloyds." Finally, there have been at all times as defendants (and appellees) several corporations affiliated with or related to ITT Life, all of which have been represented by the same counsel, and, in respects here material, taken positions essentially identical to those of ITT Life; hence, we will not further separately notice them, and, unless the context otherwise indicates, they are included within the designation "ITT Life."
 
 
 [2]
 There was evidence indicating that those business activities of the partnerships which Cates managed produced about ninety percent of the gross revenues of the partnerships; there was no evidence as to the percentage of partnership net income which those activities produced. The partnerships had a rather complicated formula for division of net partnership income among the partners; Cates testified that his share of the partnership net income was "I would say 30, 35 percent of the total."
 
 
 [3]
 For example, at the below-referenced November 25, 1981 hearing on the motion to drop the partnerships as parties, Cates' attorney stated to the court that "the basis of the suit at this point, Your Honor, is that Mr. Cates is suing for the loss--or he is suing as a partner for the loss and damages sustained by the partnership[s] by reason of the conduct of the defendants."
 At this hearing, Cates subsequently also indicated his willingness to agree to the partnerships being dropped if "Cates be allowed to recover his interest, limit our recovery to what his limited interest in the partnership is.... Mr. Cates is trying to recover any damages sustained by his membership in that partnership. That's where his damages lie.... If the Court ... drops the [partnership] parties ... the next position they [defendants] are going to take is he [Cates] has no cause of action individually for the damages he suffered insofar as it relates to loss of his partnership interest, the loss of the profit he would have derived from the partnership. Those are the damages, really are the essence of this lawsuit.... Our cause of action, essentially his cause of action is very simple. He wants to recover from ITT Life and Lloyds the damages that we allege they caused because they brought about a termination of this partnership business, and he is a one-third to fifty percent owner of this partnership, lost the value of that interest plus the loss of profits for a reasonable time to the future."
 
 
 [4]
 The state suit also had as a defendant San Jacinto Corporation, the corporate plaintiff in the federal suit, see note 1, supra
 
 
 [5]
 On November 17, 1980, Boyer, Collins, and Pettey moved that their motion to drop parties "be, at this time, withdrawn and without waiver and/or prejudice to their staying in this case as Intervenors subject to again filing" the motion to drop parties. On the same day, in response to that motion, the court ordered that the motion to drop parties "is hereby withdrawn ... without prejudice to the Intervenors ... remaining in the lawsuit ... as such Intervenors and without waiver or prejudice to such Intervenors ... refiling such" motion to drop parties
 Cates has contended that since a new motion to drop parties was never filed, the court erred in subsequently dismissing the partnerships. This contention is wholly without merit.
 To begin with, the issue of the authority of Cates to bring suit on behalf of the partnerships was raised in the defendants' answers and in ITT Life's July 1980 motion referenced in the text; any formal deficiency in these was plainly waived by Cates' failure to raise it and by his treating the issues in regard to his authority to institute and maintain suit on behalf of the partnerships as being properly before the court. Further, the docket sheet reflects that at an October 19, 1981 conference, with all counsel present, the court determined to hold a hearing on the issue of "representation of plaintiffs," with legal memoranda to be submitted within ten days. On October 29, 1981, Cates' counsel filed a memorandum in "opposition to the motion of the Intervenors and Defendants to drop the parties 'SanJac International, A Partnership ... and SanJac Association, A Partnership' ...," addressing the merits of whether he had authority to institute and maintain the suit on behalf of the partnerships, and not raising any contention that those issues were not properly raised and before the court. At the commencement of the hearing on these matters on November 25, 1981, the court stated, "Pursuant to a conference in chambers back on October 19th, it was decided that the appropriate course of action ... was to hold a hearing on two basic issues, the first dealing with the representation of the plaintiffs in this action." Cates' counsel addressed on its merits the issue of whether Cates had authority to file or maintain the suit on behalf of the partnerships, and never made any contention that it was not properly raised before the court. Pettey, et al., at the hearing, referred the court to "our second motion for the dropping of the plaintiff[s]," took the position that they opposed the filing and maintaining of the suit by the partnerships, and urged the court to "dismiss the two partnerships ... [as] party plaintiff[s] in this lawsuit"; the same position was taken by the defendants. Following the hearing, defendants filed proposed findings and conclusions to the effect that Cates did not have the authority to file or maintain the suit on behalf of the partnerships in view of the opposition of the other partners, and that Cates had no authority or standing to sue on behalf of the partnerships for any cause of action belonging to them. Pettey, Boyer, and Collins likewise filed proposed findings and conclusions which adopted those above-described of the defendants. In his proposed findings and conclusions, Cates did not raise the referenced procedural issue. Nor did Cates raise that issue in his two motions for reconsideration of the court's April 14, 1982 order dismissing the partnerships without prejudice.
 
 
 [6]
 Each partnership agreement provided in its Article 5.2 that "the consent of all Partners" was required to, among other things, "[a]ssign, pledge, transfer, release or compromise any debt owing to, or claim of the Partnership, except for full payment." Alternatively, as to SJA, in which Cates and Pettey were each fifty percent partners, Cates urged that Pettey, not being a majority partner, could not force dismissal of a properly instituted suit
 
 
 [7]
 Cates' counsel urged:
 "We would like a chance ... to seek appointment of a receiver in state court to take over the affairs of these partnerships to establish, if these partners are forcing dismissal of the lawsuit, it's not in the interest of the partnership ... under the Texas Partnership Act. I think that is a feasible remedy, just as it would be with a corporation. We have the suit on file. We just haven't done anything about it pending what the court would hold here."
 
 
 [8]
 The filing of this counterclaim against ITT Life, in February 1981, was presumably before Pettey, Collins, and Boyer resurrected their motion to drop parties, the first indication of which is the October 19, 1981 conference
 
 
 [9]
 This complaint, and the motion to file it, was returned unfiled on August 10, 1982 for failure to comply with local rules. It was retendered on August 13, 1982
 
 
 [10]
 In an August 13, 1982 second memorandum in support of its motion for summary judgment, ITT Life contended that "no derivative cause of action for a partnership interest exist[s]."
 
 
 [11]
 The following in Cates' motion apparently refers to the April and August 1982 orders, viz, "... the Court then [apparently referring to August 9, 1982] granted the dismissal based upon the representations that the claims of the partnership[s] had been properly settled. The Court entered the Order [apparently referring to the August 9, 1982 order] without a hearing or submission date, because it apparently was relying upon its previously entered Order [apparently referring to that of April 14, 1982]. Since it now appears that all partners must be a party to any effective release, we respectfully request the Court to vacate its Order dismissing" SJA and SJI
 
 
 [12]
 The confusion in this respect continued on appeal. In oral argument to this Court, ITT Life's counsel answered in the negative when asked from the bench, "[H]ave the claims of the partnerships been settled?" by stating, "They cannot be settled without the unanimous consent of all partners. So, since Mr. Cates hasn't consented, my interpretation of the partnership agreements is that no, they cannot have been settled." In the portion of its post-submission brief to this Court dealing with that issue, ITT Life states, "Boyer, Pettey and Collins did not purport to settle the partnerships' claims (if any) and when the partnerships were dismissed as Plaintiffs it was without prejudice."
 
 
 [13]
 With what might in another context be viewed as exaggeration, but which in light of the present record we can only characterize as reflecting commendable restraint and considerable understatement, the court remarked that "this case has been a procedural thorn in the side of this Court."
 
 
 [14]
 This was assertedly composed of: $30 million lost profits ($10 million past and $20 million future) from the employers' trust business; "$2 million in monies actually paid by SJA ... and SJI for claims which should have been paid by Defendants"; $15.6 million "[l]oss of profits in the eleven states over which Defendants retained exclusive rights to market"; $2 million "[a]dministrative and other operating losses."
 
 
 [15]
 Cates alleged he "received approximately $80,000 per month in salary and bonuses from the various business entities which he created, brought to success and managed, namely SJA, SJI and SJC [San Jacinto Corporation]." (As to SJC, see note 1, supra.)
 
 
 [16]
 It was requested that all these damages, except those for the mental anguish and punitive damages, be trebled under the antitrust laws
 This pleading was filed prior to the 1983 amendments to the Federal Rules of Civil Procedure. For future guidance in this and other aspects of the present litigation, we call attention to the provision of Rule 11, as so amended, that the signature of an attorney or party "constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact...."
 
 
 [17]
 The court stated:
 "... Based on the Court's review of the law, the facts as stated and alleged in plaintiff's second amended complaint, and the conclusions previously reached by this Court in its Orders of April 14, 1982 and October 26, 1982, the Court concludes that ... defendants' Motions for Summary Judgment should be granted.
 "The Court is of the opinion that plaintiff's second amended complaint does not state a personal cause of action belonging to the plaintiff Cates nor state a cause of action for which he has standing to sue. Furthermore, the Court is of the opinion that the plaintiff Cates has attempted to state and sue on causes of action belonging to the San Jac entities which had previously been dismissed by the Court's Order of April 14, 1982....
 "The Court has reached its conclusions after careful review of the law and facts as alleged in the plaintiff's second amended complaint and after giving deference and reasonable inference to the facts as alleged by the plaintiff. After such review, the Court concludes that the plaintiff has not stated an individual cause of action and that he has no standing to sue for injuries to the San Jac entities which are the basis of the factual allegations of plaintiff's second amended complaint. Plaintiff Cates' second amended complaint despite its length fails to allege any facts which will support an individual cause of action on behalf of Cates."
 
 
 [18]
 Because Cates' notice of appeal referenced the February 1983 order, but does not expressly mention the earlier orders, Lloyds takes the position that we should not consider the earlier orders. We reject this contention. We think it evident Cates intended to appeal the entire case, and it has been briefed on that basis. The February 1983 order was the final order of the district court disposing of the lawsuit, it expressly was predicated on the April and October 1982 orders, and the several orders and the issues they deal with are for the most part inextricably interrelated. See Foman v. Davis, 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962); Kicklighter v. Nails by Jannee, Inc., 616 F.2d 734, 738 n. 1 (5th Cir.1980); Comfort Trane Air Conditioning v. Trane Company, 592 F.2d 1373, 1390 n. 15 (5th Cir.1979)
 
 
 [19]
 Cates also contends that the district court erred in making fact-findings on disputed testimony as to whether the other partners authorized him to file the suit, claiming he was entitled to a jury trial on this issue. That claim was not properly raised below and is hence waived
 
 
 [20]
 Cates' reply brief in this Court states, "The Lloyds' Appellee ... argues that 'it is an elementary legal principle that a cause of action accruing to the partnership is "partnership property." ' We certainly agree with that position." The brief then states that this applies to the TUPA, citing its sections 18 and 25
 
 
 [21]
 Section 28-A of the TUPA provides that neither a partner's right in specific partnership property nor a partner's right to participate in management is community property
 
 
 [22]
 This authority correctly states:
 "The terms 'dissolution,' 'winding up,' and 'termination' are often confused. As the terms are used in the U.P.A. [Uniform Partnership Act], dissolution 'designates the point in time when the partners cease to carry on the business together; termination is the point in time when all partnership affairs are wound up; winding up, the process of settling partnership affairs after dissolution.' " Id. at 416 (footnote omitted).
 Section 30, TUPA, provides that "[o]n dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." That the partnership continues after dissolution also appears from the provision of section 25(2)(d) that the legal representative of the last surviving partner has the rights of the last deceased partner in and to possess specific partnership property for "a partnership purpose." See also Secs. 31(4), 37. Since the partnership continues, so does the provision of section 27 that the assignee (or, by virtue of section 28-B(1)(B), the deceased partner's spouse, heirs, legatees, or personal representatives) has no right to interfere in the management or administration.
 
 
 [23]
 There has been no allegation or proof that any partner was bankrupt
 
 
 [24]
 Mrs. Cates relies on Churchill v. Buck, 102 F. 38 (8th Cir.1900), but misreads that opinion. There, Martin and Blakemore were partners. Martin died in 1883, and Blakemore, the last surviving partner, then commenced the process of winding up the partnership. Blakemore died in 1895, while the partnership was still in the process of being settled. The court held that the administrator of Martin's estate was not entitled to bring an action against third parties to recover possession of any portion of the partnership lands (the suit was brought following Blakemore's death). The court stated, "[T]he death of Blakemore did not confer the right to the possession of this property to Martin's administrator. On the contrary, upon the death of the surviving partner, Blakemore, the right to the possession of the partnership property devolved upon his representative." Id. at 44. The court then quoted with approval a passage from "2 Bates, Partn. Sec. 714," including the statement that " 'in enforcing partnership claims, the representative of the last surviving partner is the proper plaintiff to collect outstanding accounts.' "
 
 
 [25]
 Such bias is illustrated by the comments of Professor Alan R. Bromberg following section 1 of Article 6132b, viz:
 "The Uniform Partnership Act leans heavily toward the entity idea, which accords with business usage. The Texas version goes even further.
 "The only significant aggregate feature of the Act is the joint and several liability of partners (Sec. 15). Even this is phrased as liability for the obligations 'of the partnership'.
 "In contrast, entity notions permeate the Act....
 "... In short, the interest in the partnership is the partner's individual property, quite independent of specific partnership property. It is fairly analogous to a share of stock in a corporation or a beneficial interest in a trust. On the other hand, his rights in specific partnership property are wholly subordinated to the rights of the partnership entity as owner of the property. Thus, he may possess the property only for partnership purposes (Sec. 25(2)(a)) and cannot alone assign his rights in it (Sec. 25(2)(b)). His individual creditors cannot seize it, nor can he claim homestead or exemption in it against partnership creditors (Sec. 25(2)(c)). At death, his rights in it vest in the surviving partners, not in his estate (Sec. 25(2)(d)). His right in it is not subject to dower or widow's allowances (Sec. 25(2)(e)), nor to community property (Sec. 28-A(1)).
 "....
 "The foregoing demonstrates that the great preponderance of the Texas Act favors the entity theory. Cases not specifically covered by the Act should be decided in harmony with the dominant entity theory. This conclusion finds additional support in Sec. 5 which calls for the Act to be supplemented by the law merchant which is traditionally associated with the entity view. Finally, it is consistent with other Texas law (preserved by Sec. 46) permitting suits in the partnership name and service on one partner. Vernon's Ann.Rules.Civ.Proc., rule 28; Vernon's Ann.Civ.St. arts. 2033, 2223." (Emphasis added.)
 
 
 [26]
 Cates' allegations that the partnerships were his "alter ego" do not change this result. It is doubtful such a theory would have validity even if factually established. See McDonald v. Bennett, 674 F.2d 1080, 1086 (5th Cir.1982); Hauer v. Bankers Trust New York Corp., 509 F.Supp. 168, 175 (E.D.Wisc.1981) (value of partnership business "directly related to the creativity and industry of the plaintiff"). But, the facts here do not support it. The undisputed evidence showed, and Cates' pleadings acknowledged, that he was not even a majority owner in either partnership. Whatever his share of the net income might have been by virtue of the role he allegedly performed as de facto managing partner of certain facets of the business, it is undisputed that the other partners' shares were also significant (i.e., Cates' testimony was that his share was thirty to thirty-five percent, though his later pleading alleged seventy percent). Finally, on his death, Mrs. Cates did not succeed to any of his managerial powers and authority
 
 
 [27]
 This would also apply to Cates himself, assuming he did not otherwise have authority to bring suit on the partnership causes of action by virtue of his position as partner
 "[3] 68 C.J.S., Partnership, Sec. 128.
 "[4] See United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119; Fleitmann v. Welsbach Street Lighting Co., 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505."
 
 
 [28]
 We agree with Hauer, however, that the question ultimately is to be resolved by reference to local law. See also Coast; Maldonado v. Flynn, 671 F.2d 729, 731 (2d Cir.1982)
 
 
 [29]
 In this regard, consideration might be given to whether the minority partner or interest owner has been reasonably diligent in seeking appointment of a receiver for this purpose, and possibly to whether delay in that regard has been, or should be, presumed prejudicial. A similar holding of the main suit in abeyance might be appropriate in certain instances where the minority partner or interest owner pursues dissolution to receive his share of the claim
 
 
 [30]
 There, it was claimed that two of three partners fraudulently settled a partnership claim against the Stockyards. The nonsettling partner (the appellant) brought suit on the claim in the partnership name against the Stockyards, and the other partners were made parties, but were later dismissed. The court observed in dicta that by the dismissal of the other partners
 "the suit of the partnership as such terminated. [Citation omitted.] Notwithstanding this, however, in view of appellant's allegations of conspiracy and fraud, the suit was properly continued for the determination of whatever right appellant might establish, for the parties could not collusively deprive appellant of any right to which he was entitled under the contract. His right in no event, however, was to recover the entire amount due upon the contract for the benefit of the partnership, but only to recover such aliquot part of the unpaid sum, if any, as appellant was entitled to as a member of the firm. In so far as Lang and Bavouset [the settling partners] were concerned, they by their settlement were undoubtedly precluded, and appellant, therefore, only lost by their fraud, if any, the amount that would have been coming to him under the terms of their partnership agreement, whatever that was." Id. at 291 (emphasis added).
 
 
 [31]
 We do not in this respect suggest the presence or absence of any such limitations on a court's power under provisions of the TUPA, such as section 32(1)(f) or the last clause of section 37, or to appoint a receiver in other circumstances. Likewise, we do not address instances where problems of this kind may have been specifically spoken to in the partnership agreement
 
 
 [32]
 However, Cates may have believed that was unnecessary, as he apparently thought that he had authority from a majority of his partners to bring the suit, and believed that in any event he had the right to do so--whether or not his partners consented, or were guilty of wrongdoing, or acted from improper motives--by virtue of being a general partner, because the partnerships were in dissolution and because the other partners eventually became parties to the case. Though we do not pass on these issues, in view of Cates' death, the authorities heretofore cited show that Cates' position was not without some support in Texas law. See Howell v. Bartlett, supra; Spiritas v. Rabinowitz, supra. Further, Cates' partners certainly acted with some vacillation, first moving to have the suit withdrawn, then withdrawing their motion, then resurrecting it
 
 
 [33]
 Whether the circumstances are such that Mrs. Cates, as Cates' personal representative, can sue on these partnership causes of action on a derivative theory, or by having a receiver appointed for the partnerships who will do so, or by suing on the proportionate part of such causes of action equivalent to her fractional partnership interest, either on account of the same kind of exceptional circumstances as would authorize a derivative suit where such is recognized, or as a result of having received distribution of a share of such cause of action in the liquidation of the partnerships, will be resolved by the court on remand in accordance with the preceding portion of this opinion dealing with such issues
 
 
 [34]
 These claims were properly dismissed as individual claims; as partnership claims, they may be dismissed on remand if Mrs. Cates does not establish her entitlement to pursue the partnership claims in any of the ways above-referenced. See note 33, supra
 
 
 [35]
 See in this connection Hauer v. Bankers Trust New York Corp., 509 F.Supp. at 175. There, the court held that where the defendant may have wrongfully taken over a partnership project, and as a part of such takeover intended to, and did, remove the plaintiff partner from his position as project manager, any damage plaintiff suffered was not recoverable except as a part of the partnership cause of action; but plaintiff could have recovered individually if the proof had supported a finding that what defendant was trying to do was to induce the partnership to breach its employment relationship with plaintiff
 
 
 [36]
 Nor do we determine whether, as to any such particular claim that may be properly individual as opposed to partnership, what may be asserted constitutes a basis for legal liability on the part of the defendants. Again, the district court did not address this, and the ruling below was made on the basis of who had the cause of action for the defendants' conduct, not whether such conduct was legally actionable by someone